**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 03-2527

NUSRET CURUMI,

Petitioner,

versus

JOHN ASHCROFT,

Respondent.

On Petition for Review of an Order of the Board of Immigration
Appeals. (A78-286-971)

Argued: November 30, 2004          Decided: January 11, 2005

Before WILKINS, Chief Judge, SHEDD, Circuit Judge, and Norman K.
MOON, United States District Judge for the Western District of
Virginia, sitting by designation.

Vacated and remanded by unpublished opinion.  Chief Judge Wilkins
wrote the opinion, in which Judge Shedd and Judge Moon joined.

**ARGUED:** Emily Michiko Morris, JONES DAY, Washington, D.C., for
Petitioner.  Anthony Cardozo Payne, UNITED STATES DEPARTMENT OF
JUSTICE, Office of Immigration Litigation, Washington, D.C., for
Respondent.  **ON BRIEF:** Julia C. Ambrose, JONES DAY, Washington,
D.C., for Petitioner.  Peter D. Keisler, Assistant Attorney
General, Civil Division, Linda S. Wendtland, Assistant Director,
Rena I. Curtis, UNITED STATES DEPARTMENT OF JUSTICE, Office of
Immigration Litigation, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.
See Local Rule 36(c).

WILKINS, Chief Judge:

Nusret Curumi petitions for review of an order of the Board of Immigration Appeals (BIA) affirming an immigration judge's opinion. The immigration judge (IJ) found Curumi's testimony incredible and, based upon this finding, denied his claims for asylum, withholding of deportation, and relief under the United Nations Convention Against Torture. Because we conclude that the IJ's adverse credibility determination, although supported by substantial evidence, is not by itself a sufficient basis for the denial of relief, we grant the petition for review, vacate the order of the BIA, and remand for reconsideration.

I.

The following are the factual assertions made in Curumi's asylum application.[1] Curumi is a native of Albania and grew up in the city of Luzii Vogel. His family was classified by the ruling communist regime as "kulak"--enemies of the government. Curumi was a member of the Democratic Party and was involved in a student group in the Albanian capital of Tirana (approximately 40 miles from Luzii Vogel), where he took correspondence courses. In 1991, he was arrested following a protest in Tirana and was held for 24 hours, during which time he was beaten by the police. Upon his

_____

[1]At the time of the immigration proceedings, Curumi spoke little or no English. Accordingly, all filings, interviews, and testimony were facilitated by interpreters.

return to Luzii Vogel, he was arrested and held for three days, during which time he was again beaten by police.

The Democratic Party came to power in 1992, and Curumi was rewarded for his loyalty with a small store, which he converted into a billiards parlor. As it became clear to Curumi that the new regime was corrupt, he began to speak out against it. As a result, police harassed Curumi's customers, and he was arrested twice in 1992. He was beaten during both arrests; during the first, his arm was broken.

Curumi went to Italy in 1993 and spent a year working there. When his employment contract ended, he returned to Albania and opened another business. Subsequently, Curumi and others began criticizing government-sponsored investment schemes that routinely failed. (Curumi himself invested and lost the equivalent of U.S. $5,000 in one of the schemes.) In response, police repeatedly harassed Curumi at his business, sometimes threatening to kill him. He was also arrested and jailed overnight in 1995, during which time police labeled him a traitor for opposing the government.

In 1997, police came to Curumi's home to arrest him. Finding Curumi absent, they arrested his father instead. Curumi surrendered to the police the next day in exchange for his father's release. He was held for three days, during which time he was beaten. The ostensible reason for the arrest was the fact that Curumi's automobile had been found abandoned; however, no charges

3

were filed. Shortly after this incident the Curumi family moved to Durres, Albania, in an effort to escape harassment.

Curumi ultimately became disaffected with the Democratic Party and became loyal to a faction of the party headed by Azem Hajdari. He attended meetings in Kavaje, Albania, where he participated in protests. In July 2000, he was arrested after one such protest and jailed for three days. He was then transferred to a prison in Durres, where he was held for 25 days. During this detention, Curumi was beaten, and he witnessed the torture of other prisoners through extraction of teeth with a rifle barrel and forced sexual acts.

In August 2000, having been warned by a cousin on the police force that his murder was being planned, Curumi entered the United States on a false passport. Upon arrival in Chicago, Curumi told immigration officials that his passport was false and that he wished to obtain asylum. Thereafter, he formally sought asylum, see 8 U.S.C.A. § 1158 (West 1999 & Supp. 2004), withholding of deportation, see 8 U.S.C.A. § 1231(b)(3) (West 1999), and relief under Article 3 of the United Nations Convention Against Torture (CAT), see United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted Dec. 10, 1984, art. 3, 23 I.L.M. 1027, 1028, 1465 U.N.T.S. 85, 114. Following a hearing at which Curumi testified, the IJ denied all relief, concluding that Curumi's testimony was not credible.

4

II.

We turn first to the BIA's determination that Curumi is not entitled to asylum or withholding of deportation. With certain exceptions not relevant here, asylum is available to one who can demonstrate that he is a "refugee," 8 U.S.C.A. § 1158(b)(1), i.e., that he is "unable or unwilling" to return to his native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C.A. § 1101(a)(42)(A) (West 1999). An applicant who demonstrates past persecution is entitled to a rebuttable presumption that he has a well-founded fear of future persecution. See 8 C.F.R. § 208.13(b)(1) (2004). An applicant who cannot demonstrate past persecution can establish a well-founded fear of persecution by demonstrating that he has a subjectively genuine fear of persecution and that a reasonable person under the circumstances would fear persecution. See Blanco de Belbruno v. Ashcroft, 362 F.3d 272, 284 (4th Cir. 2004).

The standard for demonstrating entitlement to withholding of removal is similar to, but higher than, the standard for asylum. See Lukwago v. Ashcroft, 329 F.3d 157, 182 (3d Cir. 2003). Success on a withholding of removal claim requires the alien to demonstrate that it is more likely than not that he would be persecuted on the basis of "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C.A. § 1231(b)(3)(A);

5

see Ambartsoumian v. Ashcroft, 388 F.3d 85, 88 (3d Cir. 2004). As with an asylum claim, a showing of past persecution creates a rebuttable presumption that the applicant will be persecuted if returned to his native country. See 8 C.F.R. § 208.16(b)(1) (2004).

We must affirm the decision of the BIA if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (internal quotation marks omitted). To obtain reversal, Curumi must demonstrate "that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." Id. at 483-84. Credibility determinations of the IJ and BIA are entitled to deference so long as they are supported by substantial evidence. See Figeroa v. INS, 886 F.2d 76, 78 (4th Cir. 1989); see also Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (stating that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance" (internal quotation marks omitted)). "[A] trier of fact who rejects a witness's positive testimony because in his or her judgment it lacks credibility should offer a specific, cogent reason for ... disbelief." Figeroa, 886 F.2d at 78 (internal quotation marks omitted).[2]

_____

[2]Curumi attempts to turn the IJ's credibility finding into a legal error (subject to de novo review) by asserting that the IJ applied an incorrect legal standard. The IJ clearly stated the

6

Perfect consistency is not required of an asylum applicant; the BIA has acknowledged that those who flee persecution may not have precise recall. See, e.g., In re B-, 21 I & N Dec. 66, 70 (BIA 1995) (concluding that applicant's testimony was not incredible simply because he was unable to recall precise dates).

Curumi maintains that the discrepancies noted by the IJ as supporting her adverse credibility determination are either nonexistent or easily explained. While we agree with Curumi that not all of the cited discrepancies support the adverse credibility determination, ultimately we conclude that there is substantial evidence in the record to support the IJ's finding that Curumi's testimony was not credible.

The IJ noted inconsistencies in the following areas:

<u>Education</u>:  On his asylum application, Curumi indicated that he attended high school from September 1984 until May 1988. In supplemental materials, Curumi indicated that he attended correspondence courses in Tirana, which led to his involvement in the student protest group. The IJ noted that at the hearing, Curumi testified that "he attended night school for five years, graduated in 1989, and then studied one-and-a-half years of college-level agricultural studies as a correspondence student." J.A. 16. The IJ stated that Curumi's inconsistencies regarding his

correct standard, however. Therefore, there is no legal error and the only question is whether the IJ's credibility determination is supported by substantial evidence.

education--including his "omission" of his correspondence studies from the asylum application--"call into question whether he attended college, thereby making his political activity as a university student implausible." Id.

Detentions: The IJ generally found that Curumi "was inconsistent in his recollection of the length, general time of year, and circumstances of his detentions." Id. She noted inconsistencies in the following specific areas:

1991 arrest in Tirana: Curumi's asylum application states that he was arrested in February 1991 and detained for 24 hours. During the asylum hearing, however, he testified that the detention lasted only six hours; he further stated that he could not recall when in 1991 the detention occurred. Additionally, Curumi testified that during this detention he observed law enforcement officers torturing other prisoners by removing their teeth with rifle barrels, but his asylum application claimed that he observed this and other forms of torture during a detention in 2000.

Further police contact in 1991: Although Curumi's asylum application states that he was arrested in Luzii Vogel almost immediately after the Tirana detention, he testified at the asylum hearing that he had no further contact with the police in 1991. But, he also testified that he was again arrested near "the end of 1991 or the beginning of 1992" and that

8

during this arrest his arm was broken.  Id. at 24.  The asylum application does recount that the police broke Curumi's arm, but identifies the date of the incident as April or May 1992.

1992-1993:  Curumi's asylum application states that in July or August 1992 he "was arrested and imprisoned ....  Police wearing black masks beat me with batons and lengths of rubber hose."  Id. at 67.  During the hearing, however, Curumi testified that he was called to talk with the chief of police, but not imprisoned, between the breaking of his arm in 1991-92 and when he went to Italy in 1993.

Detention after Hajdari meeting:  In his asylum application, Curumi stated that he was arrested after a July 2000 meeting of the Hajdari faction.  According to the asylum application, Curumi was detained for three days in Kavaje, then transferred to a prison in Durres, where he was detained for 25 days. During the hearing, however, Curumi testified that he was held for 24 hours in Kavaje, then for 27 days in Durres.  When questioned about this inconsistency, Curumi asserted that the asylum application was incorrect--his three-day detention in Kavaje took place in 1992.

The IJ concluded that Curumi's "inconsistencies and omissions, and his failure to provide a plausible explanation for them, cast doubt on whether he experienced persecution in the form of detention."  Id. at 17.

Democratic Party membership: In his asylum application, Curumi stated that he "never officially renounced" his party membership but that he "grew disenchanted" with the party and became a part of Hajdari's faction. Id. at 65. During the asylum hearing, however, Curumi testified that he resigned his membership from the Democratic Party, stopped paying his dues, and turned in his party identification. When questioned about the discrepancy, Curumi said he did not remember his asylum application saying that he never renounced his party membership.

We have reviewed the record in its entirety, and in our view the IJ made too much out of some perceived discrepancies. For example, the IJ doubted Curumi's involvement in the student movement because his asylum application "omitted his studies as a correspondence student and was inconsistent with his testimony." Id. at 16. However, Curumi's participation in correspondence studies was noted in his supplemental materials, and he provided what appears to be a rational explanation for his failure to list it on the asylum application (i.e., that Albanians do not consider correspondence studies to be "school"). There was thus no omission, and the differences between the asylum application and Curumi's testimony are not as significant as the IJ made them out to be.

The same view may be taken of Curumi's inconsistent recollection of his 1991 arrest and detention in Tirana. It

10

appears to be undisputed that Curumi was detained and severely beaten. Nevertheless, the IJ seized on Curumi's inability to recall the <u>length</u> of his detention. While under some circumstances an inability to recall the particulars of an event may provide a basis for an adverse credibility determination, it is important to bear in mind that Curumi was detained and beaten on numerous occasions for varying lengths of time. The fact that he may have confused the particulars of these traumatic events is not, alone, a death knell for his credibility.[3] <u>See</u> <u>Zubeda v. Ashcroft</u>, 333 F.3d 463, 476 (3d Cir. 2003) ("Caution is required [in basing a credibility determination on differences between an asylum application and hearing testimony] because of the numerous factors that might make it difficult for an alien to articulate his/her circumstances with the degree of consistency one might expect from someone who is neither burdened with the language difficulties, nor haunted by the traumatic memories ....").

Despite these concerns, we nevertheless conclude that the IJ's adverse credibility determination is supported by substantial evidence. For example, we cannot accept Curumi's assertion that

---

[3]The IJ made a point of noting that a doctor told Curumi his arm was "fractured," while Curumi stated that it was "broken." It is not clear that the IJ relied on this difference in making her credibility determination. To the extent she did so, however, she erred; "fractured" and "broken" are synonyms. <u>Compare</u> <u>Random House College Dictionary</u> 171 (rev. ed. 1980) (defining "broken" in part as "ruptured; torn; <u>fractured</u>" (emphasis added)), <u>with</u> <u>id.</u> at 524 (defining "fracture" in part as "the breaking of a bone").

11

the discrepancies concerning police detentions following the detention in Tirana, including the date of his broken arm, are "exceedingly minor inconsistencies" that "do nothing to detract from [his] credibility." Opening Br. of Pet'r Nusret Curumi at 27. To the contrary, these inconsistencies may plausibly be viewed as indications of Curumi's inability to keep his stories straight. The same may be said of Curumi's vastly different statements regarding his Democratic Party membership, particularly when viewed in light of his failure to offer a cogent explanation for the differences.

The question remains, however, whether the adverse credibility determination is necessarily fatal to Curumi's asylum and withholding of deportation claims. We faced a nearly identical situation in Camara v. Ashcroft, 378 F.3d 361 (4th Cir. 2004), and answered that question in the negative. We find that Camara is controlling here and that we must remand for reconsideration.

In Camara, as here, the IJ denied relief based upon an adverse credibility determination that was supported by substantial evidence. See id. at 368-69. While we acknowledged that an adverse credibility determination is often fatal to an asylum claim, see id. at 369, we noted that when "the applicant can prove actual past persecution, ... a presumption arises that she has the requisite level of fear of persecution, and thus she need not prove the subjective component of 'well-founded fear,'" for which

12

credibility is essential, id. at 369-70.  Because Camara had presented independent evidence that established past persecution for her political beliefs, we concluded that remand was necessary:

> This independent evidence, taken together, provided strong circumstantial evidence that Camara was imprisoned for a political expression of opposition to the ruling government.  The IJ completely ignored this evidence, instead rejecting Camara's asylum petition solely on the basis of the adverse credibility determination.
>
> ....
>
> In sum, while we do not disturb the IJ's factual finding that Camara's recollections may not have been wholly trustworthy, we nevertheless conclude that the IJ erroneously overlooked Camara's other evidence in denying her application for asylum and for withholding of removal. Accordingly, we vacate the BIA's order on these claims ... and remand for further consideration.

Id. at 370-71.

Here, as in Camara, there is substantial independent evidence of past persecution that was not considered by the IJ.  The most compelling of this evidence consists of two medical reports indicating that Curumi was beaten by police.  Arrest reports corresponding to the dates of the medical reports indicate that Curumi was arrested for engaging in anti-government protests.

Curumi also presented affidavits from psychologist Karen Hanscom and physician Bruce Slater.  Dr. Hanscom diagnosed Curumi as suffering from depression and post-traumatic stress disorder (PTSD), the symptoms of which included avoidance of police, fear of being killed, hypervigilance, and problems with concentration and memory.  She characterized these symptoms as "consistent with

13

symptoms seen in other individuals who have experienced physical and emotional torture and trauma." J.A. 36. Dr. Hanscom further stated that Curumi's depression and PTSD "are the direct result of the trauma and the physical and psychological abuses that Mr. Curumi experienced in Albania. I find the symptoms to be consistent with the history of trauma and torture that he reports." Id. For his part, Dr. Slater found scars on Curumi's legs and scalp, the latter of which was "consistent with blunt trauma." Id. at 72. Dr. Slater concluded that Curumi showed signs of PTSD "as well as physical evidence of beating with blunt objects, consistent with the history that he has given." Id. at 73.

Additionally, Curumi presented evidence that pro-democracy activists in Albania regularly suffer persecution. Nicholas Pano, a former history professor who is an expert regarding Albanian politics, stated in an affidavit that "the events that Nusret Curumi has described ... are consistent with political events and conditions in Albania at the times noted in his statements." Id. at 38. The record also contains a 2001 State Department report on Albania which indicates that local police officers arbitrarily detain individuals and regularly engage in beatings. And, a May 2001 report by Amnesty International indicates that Democratic Party supporters are routinely detained and beaten by police.

This documentary evidence, and those portions of Curumi's testimony that the IJ did not specifically reject, provide

14

substantial support for a finding that Curumi has suffered persecution at the hands of the Albanian government. Cf. Camara, 378 F.3d at 370 (concluding that arrest report, party membership card, letter from party leader, arrest warrant, and State Department report "provided strong circumstantial evidence" supporting claim of past persecution). If accepted, this evidence would support both a claim for asylum and a claim for withholding of removal. See id. Because, as in Camara, the IJ failed to consider this independent evidence, we vacate the decision of the BIA and remand for further proceedings.

## III.

Curumi also sought relief under the CAT. As a signatory to the CAT, the United States has pledged "not [to] expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." Lopez-Soto v. Ashcroft, 383 F.3d 228, 239 (4th Cir. 2004) (internal quotation marks omitted). In order to establish eligibility for relief under the CAT, Curumi must demonstrate that "it is more likely than not" that he would be tortured if returned to Albania. Id. at 239-40 (internal quotation marks omitted). "Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person ... for any reason based on discrimination of any kind ... by or at the

15

instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1) (2004).

The IJ denied relief under the CAT based solely on "the reasons cited above in the denial of Asylum," J.A. 19, i.e., Curumi's lack of credibility. However, "[b]ecause there is no subjective component for granting relief under the CAT, [an] adverse credibility determination ... would not necessarily defeat [a] CAT claim." Camara, 378 F.3d at 371. The independent evidence that supports Curumi's asylum claim likewise supports his claim under the CAT. See id. at 371-72; id. at 372 (noting that IJ violated INS regulations by failing to consider independent evidence demonstrating likelihood of torture); see also Ramsameachire v. Ashcroft, 357 F.3d 169, 184 (2d Cir. 2004) ("[W]e hold that the INS may not deny an alien's CAT claim solely on the basis of its determination that the applicant's testimony is not credible."). We therefore vacate the decision of the BIA as to the denial of relief under the CAT and remand for further proceedings.

IV.

For the reasons set forth above, we vacate the order of the BIA and remand for further proceedings. Additionally, as we did in

16

<u>Camara</u>, we recommend assignment to a different immigration judge on remand.

<u>VACATED AND REMANDED</u>