Djenaba CAMARA, Petitioner,

v.

John ASHCROFT, in his official capacity as Attorney General of the United States, Respondent.

No. 03–1435.

United States Court of Appeals, Fourth Circuit.

Argued: June 4, 2004.

Decided: Aug. 6, 2004.

**ARGUED:** Christopher James Flack, Arnold & Porter, L.L.P., Washington, D.C., for Petitioner. Catherine Yvonne Hancock, Civil Division, Appellate Staff, United States Department of Justice, Washington, D.C., for Respondent. **ON BRIEF:** Susan G. Lee, Paul S. Feira, W. Daniel Deane, Arnold & Porter, L.L.P., Washington, D.C., for Petitioner. Peter D. Keisler, Assistant Attorney General, Thomas M. Bondy, Colette G. Matzzie, Civil Division, Appellate Staff, United States Department of Justice, Washington, D.C., for Respondent.

Before WILKINS, Chief Judge, and NIEMEYER and TRAXLER, Circuit Judges.

Judge NIEMEYER wrote the opinion, in which Chief Judge WILKINS and Judge TRAXLER joined.

## OPINION

NIEMEYER, Circuit Judge:

Djenaba Camara's claims for asylum under 8 U.S.C. § 1158(b), for withholding of removal under 8 U.S.C. § 1231(b)(3), and for relief under the United Nations Convention Against Torture were denied based on the Immigration Judge's finding that Camara's testimony was not credible. Because the Immigration Judge failed to consider other, independent evidence presented by Camara and applied the incorrect standard for relief under the Convention Against Torture, we grant Camara's Petition for Review, vacate the order of the Board of Immigration Appeals (as well as the Immigration Judge's decision, inasmuch as it was made the final agency determination), and remand for further proceedings.

### I

Djenaba Camara, a 34–year–old Guinean national, entered the United States on a tourist visa on April 22, 2000, stating that she was coming to attend a wedding but actually intending to seek asylum here. On August 2, 2000, she filed a Form I–589 with the INS,[1] applying for asylum and for withholding of removal, stating that she was eligible for asylum "because [she] was raped, arrested, imprisoned and tortured on several occasions in [her] home country for being politically active in the opposition party ... RPG." Camara also applied for relief under Article 3 of the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading

---

1. The Immigration and Naturalization Service ("INS") was the name of the agency during the proceedings in this case. While we continue to refer to the agency as the INS, it has since been renamed and reorganized. *See* 6 U.S.C. § 291; 8 C.F.R. § 1.1(d).

Treatment or Punishment, which was implemented by § 2242 of the Foreign Affairs Reform and Restructuring Act of 1998, Pub.L. No. 105–277, Div. G, 112 Stat. 2681, 822 (Oct. 21, 1998) (codified at 28 U.S.C. § 1231 note) ("Convention Against Torture" or "CAT"). Camara attached to her application for asylum numerous documents, including a personal statement of her circumstances, her membership card for the RPG, a warrant for her arrest that led to her imprisonment, a warrant for her arrest following her escape from prison, and official statements about the political conditions in Guinea. Camara's application was referred to the Immigration Court by the INS.

At her asylum hearing, Camara testified that she was a member of a political party known as the "Rassemblement du peuple de Guinee" (Rally of the Guinean People) ("RPG"), which not only is a political party but also is composed mostly of the Malinke ethnic group to which Camara belongs. The government is composed of members of the Soussou ethnicity. Camara claimed that, because of her participation in activities of the RPG, she was arrested, imprisoned and tortured on three separate occasions, beginning in 1993.

Camara testified that her first arrest was in 1993 for demonstrating with students, after which she was imprisoned at the Central Prison in Kankan, Guinea, for two weeks. She asserted that she was "beaten every day, every morning" and that because she did not have money to bribe the guards, they would not release her unless she had sex with one of them. Eventually, she said that she decided to do so and was released.

She testified that she was imprisoned a second time, in 1996, after an unsuccessful coup d'état. On this occasion, she said that she was taken to Camp Alpha Yaya in Conakry, Guinea, a military camp, where she was accused of having participated in the coup attempt. She testified that she was detained a little over a month at Camp Alpha Yaya and again beaten on the hands and the feet in order to extract a confession. When the government, however, determined that the RPG had not organized the coup d'état, Camara was released.

Camara testified that her third imprisonment followed the Guinean presidential election on December 14, 1998. On the day after the election and before the votes were counted, incumbent President Lansana Conté had several opposition leaders arrested, including Alpha Condé, the leader of the RPG. In response to President Conté's interference with the election and the imprisonment of Condé, the women of the RPG organized protest marches, in which some women marched naked. Camara presented a Canadian article describing a protest march that took place on December 21, 1998, but she stated that she participated in a march on December 28, 1998. Following this demonstration, on January 2, 1999, a warrant for Camara's arrest was issued, and on January 5 Camara was arrested and taken to Camp Alpha Yaya, where she spent two weeks before being transferred to the Central Prison of Conakry. After four months at the Central Prison, Camara was transferred back to Camp Alpha Yaya for another seven months. Her imprisonment totaled 11 months, during which she claimed that she was beaten, tortured, and raped. She also stated that she miscarried a pregnancy during this detention. (In her personal statement accompanying her Form I–589, however, she had described this miscarriage in detail as happening during her *1996* imprisonment at Camp Alpha Yaya.) After her husband bribed officials and contacted an underground member of the RPG, who was also a police commissioner, a guard allowed Camara to

escape from Camp Alpha Yaya on December 23, 1999. Camara provided a copy of an official document giving notice of her escape and a "search warrant" directing that she be found, apprehended, and brought to the Central Prison in Conakry.

Camara provided evidence of several incidents following her escape that revealed that government officials were seeking to rearrest her. In the last of these incidents, the military broke into the home of a friend to search for her, and the friend died of a stroke. After that incident, Camara decided that she would have to leave Guinea. The police commissioner who had helped Camara escape from prison in December 1999 also helped her leave the country, telling her that if she knew anyone at the District Court, she should go to that person and have him obtain copies of various papers to show that she had been persecuted by the government. Her mother's cousin worked at the District Court, and Camara engaged the cousin to obtain copies of her original arrest warrant, her notice of escape, and the warrant for her arrest following her escape.

In the application form she filed with the INS, Camara stated that she had no children, despite the fact that she had left two children in Guinea with her grandmother. She testified at her hearing before the IJ that the reason she lied about her children on the asylum application was that she had received advice from a Guinean friend who had been in the United States longer than she had. He told her to say that she had no children on her initial asylum application because if she admitted to having children, "the Immigration Service would consider [her] a bad mother for having left [her] children there." She supported this explanation at the hearing with a detailed affidavit from the friend who had wrongly advised her.

Camara also presented the testimony of an expert psychologist who specialized in evaluating and treating torture victims. He termed Camara "highly credible" and stated, "I know she's a victim of torture.... [I]t's not just the reporting, it's that her symptoms are so pervasive as to govern her appearance, her ability to talk about anything."

Camara introduced into the record a letter from the current leader of the RPG, Mohamed Diané, who stated that Camara had been arrested for participating in political activities with the RPG. She also introduced State Department country reports for Guinea, which stated that the Guinean government is oppressive and dictatorial, with a "poor" record on human rights, especially in terms of abuses against political dissidents. The reports stated that during the December 1998 election in Guinea, the leader of the RPG, along with the leaders of other opposition parties, was arrested and imprisoned for two and a half years for sedition. RPG members protesting these elections were shot and killed. The reports indicated that officials acting under the authority of the Guinean government used torture against prisoners and detainees, stating:

> There were ... reports that security forces often use torture and beatings to extract confessions and employ other forms of brutality.... Local human rights organizations and former detainees stated that some prisoners are bound and hung by their feet before being beaten.... Prison conditions are inhuman and life threatening.... Prisoners reported threats, beatings, and harassment by guards.... During [recent] municipal elections, police arrested and detained 44 persons, including children, women, old men, and an imam. They were taken to a military camp, where they reportedly were stripped, threatened, beaten, and tortured.

Following Camara's hearing, the Immigration Judge ("IJ") rendered an oral opinion denying Camara's claim to refugee status, citing six instances in Camara's testimony and in her initial application for asylum that the IJ characterized as "a series of inconsistencies and improbabilities." The IJ stated that these flaws in the testimony gave her "serious concerns about the respondent's credibility." After denying Camara asylum because of this adverse credibility determination, the IJ also denied Camara's claims for withholding of removal under § 1231(b)(3) and for relief under the Convention Against Torture.

Camara appealed her claims to the Board of Immigration Appeals ("BIA"), and the BIA used its streamlined procedure to affirm the IJ's order of removal without an opinion. The BIA's order stated: "The Board affirms, without opinion, the results of the decision below. The decision below is, therefore, the final agency determination. *See* 8 C.F.R. § 1003.1(e)(4)."

From the Board's decision, Camara filed this petition for review, in which she contends (1) that the IJ erred in discrediting her testimony in support of her claims and in failing to consider her independent evidence that alone could establish her eligibility for asylum and for withholding of removal, and (2) that the IJ's adverse credibility finding was insufficient to defeat her claim for relief under the Convention Against Torture.

## II

The courts of appeals are granted jurisdiction to review final orders of removal, 8 U.S.C. § 1252(a)(1), and final orders in cases such as the one before us are generally made by the BIA following appeal from the decision of the IJ.

In this case, the BIA followed a streamlined process for reviewing IJ orders that was put in place in 1999 to increase efficiency and to reduce the existing backlog of cases. Accordingly, the BIA, through a single member, affirmed without opinion the "results" of the IJ's decision and ruled that the IJ's decision itself was the "final agency determination." Regulation 1003.1(e)(4), to which the BIA referred, authorizes an affirmance by a single board member without opinion when (1) the result reached by the IJ is correct; (2) any errors by the IJ are "harmless or nonmaterial"; and (3) the issues on appeal are squarely controlled by precedent, *or* the factual and legal issues are not so substantial that a written opinion is warranted. *See* 8 C.F.R. § 1003.1(e)(4). The regulation also provides that when the BIA approves the result reached by the IJ, it does not "necessarily imply approval of all of the reasoning." *See id.*

■ Under the streamlined process, the BIA's opinion thus concluded that the IJ's result was correct and that, if her reasoning was in error in any respect, the error was harmless. And for purposes of review, the IJ's reasoning became "the final agency determination." Accordingly, while we review the BIA's final order for correctness, we review the IJ's decision for the reasoning, recognizing that the Board has concluded that any error in reasoning is "harmless or nonmaterial." *See* 8 C.F.R. § 1003.1(e)(4); *Khattak v. Ashcroft,* 332 F.3d 250, 253 (4th Cir.2003) (noting that when the "streamlining regulations are employed," the IJ's decision is "essentially the decision under review"); *see also Falcon Carriche v. Ashcroft,* 335 F.3d 1009, 1013 (9th Cir.2003) (noting that "[s]treamlining thus elevates the IJ's decision to the final agency action that is reviewed by the court of appeal"); *Georgis v. Ashcroft,* 328 F.3d 962, 967 (7th Cir.2003)

(same); Single Board Member Summary Affirmance Without Opinion, 64 Fed.Reg. 56,135, 56,138 (Oct. 18, 1999).

■ We conduct our review of the final agency determination, whether streamlined or not, under the same standard—we uphold the agency's decision if it is not "manifestly contrary to law." 8 U.S.C. § 1252(b)(4)(C). And agency findings of fact "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* § 1252(b)(4)(B); *see also INS v. Elias-Zacarias,* 502 U.S. 478, 481 n. 1, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). We also defer to credibility findings that are supported by substantial evidence. *Figeroa v. INS,* 886 F.2d 76, 78 (4th Cir.1989). Though broad, this deference is not absolute:

> Although an Immigration Judge's credibility findings are granted substantial deference by reviewing courts, a trier of fact who rejects a witness's positive testimony because in his or her judgment it lacks credibility should offer a specific, cogent reason for his disbelief.

*Id.* (internal quotation marks and citations omitted).

### III

On her claims for asylum under 8 U.S.C. § 1158(b) and for withholding removal under 8 U.S.C. § 1231(b)(3), Camara contends that the IJ erred by relying on an unsupported credibility finding and by overlooking objective evidence beyond the discredited evidence.

■ Under § 1158(b), the Attorney General has the discretion to admit into the United States an applicant for asylum if the applicant first establishes that she is a "refugee." A "refugee" is defined as one who is "unable or unwilling" to return to her native country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). If the applicant establishes that she has suffered past persecution, a presumption arises that she has the requisite level of fear of persecution. 8 C.F.R. § 208.13(b)(1). That presumption can be rebutted by the INS if the INS can show by a preponderance of the evidence that conditions in the native country have changed such that if the applicant were to return, she would no longer have a well-founded fear persecution. *Id.* § 208.13(b)(1)(i)(A); *see also Gonahasa v. INS,* 181 F.3d 538, 541–42 (4th Cir.1999). If an applicant cannot establish past persecution, she must prove both the subjective and the objective components of "a well-founded fear": that the applicant is *subjectively* afraid and that the fear is *objectively* well-founded.

■■ An application for withholding of removal under 8 U.S.C. § 1231(b)(3) is closely related to an application for asylum. It differs in that if the applicant qualifies for withholding of removal, the Attorney General *cannot* remove her to her native country. A withholding-of-removal claim carries a higher standard of proof than does an asylum claim. An applicant for withholding of removal must establish that if she were sent back, it is more likely than not that her "life or freedom would be threatened ... because of [her] race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1231(b)(3)(A); 8 C.F.R. § 208.16(b)(1). Because the burden of proof for withholding of removal is higher than for asylum—even though the facts that must be proved are the same—an applicant who is ineligible for asylum is necessarily ineligible for withholding of removal under § 1231(b)(3).

■ In contending that the IJ erred in disposing of her claims for asylum and for withholding of removal on the basis of credibility, Camara argues that the IJ (1) relied only on minimal, irrelevant, and immaterial discrepancies, some of which were no more than speculation and were not borne out by the record, and (2) failed to consider independent, objectively established evidence that both corroborated her testimony and independently proved her claims. Camara contends that the six justifications that the IJ put forth for her adverse credibility determination are "simply insufficient" to discredit her testimony. In particular, Camara points to the following determinations by the IJ:

*First,* Camara stated on her initial asylum application that she had no children, and it was only when the government found her visa application with different information that she admitted she had two children and had lied about them on her asylum application. Camara explained that she omitted her children on the advice of a Guinean friend who told her that if she admitted to having children, "the Immigration Service would consider [her to be] a bad mother for having left [her] children there."

*Second,* on her initial asylum application, Camara said she miscarried a pregnancy while in prison in 1996, but in testimony she stated that she actually miscarried during her 1999 prison stay.

*Third,* to corroborate her story of being imprisoned and tortured for participating in a December 1998 protest against the government where members of RPG wore minimal clothing to show their disrespect, Camara submitted a Canadian newspaper article documenting one such protest. The date Camara gave for the protest she attended was December 28, while the article documented a protest on December 21.

*Fourth,* Camara produced a letter from Mohamed Diané, a leader in the RPG, to corroborate her testimony that she had been arrested three times—once after participating in a demonstration, once after a failed coup attempt of which she was not a part, and once after she participated in a women's demonstration to protest the RPG leader's detention. As translated from the French, Diané's letter says, "She has been arrested three times for having participated in RPG political meetings. Lately, during RPG women protests ..., Mrs. Djenaba Camara was arrested one more time...." The IJ decided that "this letter d[id] not corroborate these three arrests" because Diané reported four arrests and because he referred to "meetings," not demonstrations.

*Fifth,* Camara testified that when she was planning to leave Guinea and try to find asylum in the United States, a friend told her that she would need to get documentation of persecution by the government. She testified that the friend "told [her] to go to the District Court to see if [she] could know somebody there who would help me [her]." She said that because her mother's cousin worked at the courthouse, she approached him to obtain her papers. The Immigration Judge found "improbable" the idea that Camara would go to the District Court to get the documents, stating, "It simply makes no sense to this Court that someone who had just escaped from prison would then present themselves to a dictatorial Government legal institution."

*Sixth,* the IJ found it "curious" that the notice of escape presented by Camara stated that she was "condemned" on January 5 by the Court of Justice, while Camara testified that she was never brought before a judge.

We agree with Camara in part, concluding that several of the "discrepancies" fail

to support the IJ's finding on credibility. First, the one-week discrepancy between the article's date for the women's protest and the date Camara gave is not an inconsistency. There was evidence that the women conducted multiple protests, including a State Department report that there was "civil unrest before and after election day." And even though the Canadian news article wrote of a protest march on December 21, Camara was firm that her participation in a protest march occurred on December 28, a fact corroborated by the warrant that thereafter issued for Camara's arrest. Second, the letter from party leader Diané corroborated Camara's account generally, and the IJ put far too much importance on the translated word "meetings" in deciding that this letter was inconsistent with Camara's testimony referring to protests or demonstrations. Third, the IJ's disbelief of Camara's explanation for obtaining her criminal papers was based only on speculation; there is nothing implausible about the idea that Camara would approach a relative for help in her troubles, even if it meant entering a courthouse as an anonymous visitor. Fourth, the IJ's assumption about the Guinean justice system—that accused criminals are never "condemned" without a hearing before a judge—was unsupported and therefore does not support an adverse credibility determination. The copies of the official action taken by the Guinean government show that a warrant for Camara's arrest issued on January 2, 2000, that Camara was arrested on January 5, and that Camara was "condamné," meaning "convicted," on January 5.

The other two inconsistencies are, however, more substantial. Although Camara gave a plausible explanation for failing to acknowledge her children on her initial asylum application, she did state an untruth, and the IJ was free to reject her explanation. As for the misdating of Camara's miscarriage, this might have been considered a minor detail if not for the fact that she credited it as having "renewed [her] will to fight against the Conté government." If the miscarriage instead happened during her 1999 imprisonment, it would actually have been followed by a decision to leave the country in fear for her life. Camara compounded the misstatement by adding that through this miscarriage she "lost the only pregnancy [she] had ever ha[d]," while in fact, as she revealed in her later testimony, she had already given birth to two children. Her account of a miscarriage is not merely incidental to her asylum claim, in that it is one of the circumstances she recounted to show the extent of her persecution.

Because of these two inconsistencies, we cannot say that we are "compelled to conclude" that Camara's testimony was entirely reliable. *See* 8 U.S.C. § 1252(b)(4). There was substantial evidence on which the IJ could support her adverse credibility determination. *See Figeroa,* 886 F.2d at 78.

█ But our affirmance of the IJ's adverse credibility finding does not end our review of the IJ's conclusion that Camara was not statutorily eligible for asylum as a refugee. It is true that "an unfavorable credibility determination is likely to be fatal to [an asylum] claim," *Rusu v. INS,* 296 F.3d 316, 323 (4th Cir.2002), because often the applicant must establish a "well-founded fear" of persecution, which contains both subjective and objective components, and the subjective element cannot generally be proved other than through the applicant's testimony. Thus, a determination that the applicant's testimony is not credible will generally defeat the claim. In cases where the applicant can prove actual past persecution, however, a presumption arises that she has the requisite

level of fear of persecution, and thus she need not prove the subjective component of "well-founded fear." *See* 8 C.F.R. § 208.13(b)(1).

In this case, quite apart from Camara's somewhat discredited testimony, Camara presented independent evidence, which the IJ did not discredit, demonstrating Camara suffered past persecution for her political beliefs.[2] Camara presented a "Notice of Escape," dated December 25, 1999, which documented her escape from Camp Alpha Yaya on December 23, 1999. This document demonstrated that Camara had been imprisoned, which indisputably can constitute persecution. *See Capric v. Ashcroft*, 355 F.3d 1075, 1084 (7th Cir. 2004). She also offered evidence to establish that she was imprisoned "on account of ... political opinion" through (1) her membership in the RPG, as shown by her membership card and the letter from Diané; (2) the reason given for her conviction on the warrant and in the letter from Diané, and (3) the State Department reports recording the brutal suppression of the RPG, including the imprisonment of its members. The arrest warrant she produced, dated January 2, 1999, indicated Camara was wanted for "disturbing the public order" on December 28, 1998. While "disturbing the public order" could mean many things, other documents provided strong circumstantial evidence that here, the "disturbance" was actually the political protest about which Camara testified. In addition, the letter from RPG leader Diané stated that Camara had been arrested for participating in "RPG women protests against the abduction and sequestration of the RPG's leader." Diané was referring to the arrest and imprisonment of Alpha Condé, the then-leader of RPG, which the State Department reported as having occurred in December 1998. The State Department also reported "civil unrest before and after election day," December 14, and that the arrest of Condé "led to street protests" that "result[ed] in the arrest and detention of many protestors."

This independent evidence, taken together, provided strong circumstantial evidence that Camara was imprisoned for a political expression of opposition to the ruling government. The IJ completely ignored this evidence, instead rejecting Camara's asylum petition solely on the basis of the adverse credibility determination.

This independent evidence could also serve as a basis for Camara's application for withholding of removal under 8 U.S.C. § 1231(b)(3), which requires a showing that it is more likely than not that if the applicant were removed to her native country, her "life or freedom would be threatened." As in an asylum claim, if the applicant has established a *past* threat to life or freedom, a rebuttable presumption arises that the threat would likely recur if she were sent back. *See* 8 C.F.R. § 208.16(b)(1)(i). Furthermore, in this case, along with the evidence of past imprisonment for political reasons, Camara has presented the warrant for her arrest that issued two days after her escape and

---

**2.** While not explicitly rejecting this evidence, the IJ expressed suspicion about the documents Camara obtained from the courthouse only because her story of obtaining them from her cousin "ma [d]e[ ] no sense." This would appear, however, to be mere speculation. There was no evidence in the record contradicting Camara's account of having obtained the documents, and there is nothing inherently implausible about her story. She did not say that she "presented" herself at the courthouse, as the IJ stated, but that she went as a private visitor to the office of a relative who could help her. The IJ's skepticism about Camara's explanation for having obtained the documents based only on this speculation was not, therefore, a sufficient basis on which to rest a finding that the documents were forged or otherwise lacked authenticity.

that stated that police should "search [for Camara] very actively, to apprehend and to bring [her] before the manager of the Central Prison of Conakry." The warrant also stated that Camara was "condemned," or convicted, on January 5, 1999 "for disrupting the public order" and that she "escaped on December 23, 1999." She thus provided evidence that, if returned to Guinea, her freedom would be threatened as a result of the same "disrupt[ion of] the public order" that circumstantial evidence suggests was actually a political demonstration in the wake of a presidential election.

In sum, while we do not disturb the IJ's factual finding that Camara's recollections may not have been wholly trustworthy, we nevertheless conclude that the IJ erroneously overlooked Camara's other evidence in denying her application for asylum and for withholding of removal. Accordingly, we vacate the BIA's order on these claims, as well as the IJ's decision inasmuch as it was made the final agency decision, and remand for further consideration.

## IV

 Camara also contends that the IJ relied on improper or insufficient grounds to reject her claim under the Convention Against Torture. In particular, she contends that the IJ erred "by treating an adverse credibility determination made in connection with Petitioner's asylum claim as fatal to Petitioner's CAT claim and by failing to give the CAT claim meaningful consideration independent of the asylum claim." She argues that the CAT claim has a "separate and distinct legal standard" that requires "an independent and meaningful analysis," which the IJ did not conduct.

In her decision, the IJ articulated, over the span of several pages, why she thought

that Camara's testimony should be discredited, concluding:

> Based on what this Court perceives to be a series of inconsistencies and improbabilities, it finds that the respondent has failed to meet her burden in establishing either past persecution, or a well-founded fear of future persecution....

On this finding, the IJ denied Camara's application for asylum and for withholding of removal. Then the IJ proceeded to employ this finding, without more, to decide the CAT claim, disposing of it in one sentence:

> For the aforementioned reasons, this Court also finds that this Respondent has failed to meet her burden in establishing that it is more likely than not that she would be tortured as contemplated by the Torture Convention were she to return to Guinea.

 As we noted above, an alien seeking asylum must prove either past persecution or a well-founded fear of future persecution "*on account of*" her membership in a particular protected class. The standard for relief under the CAT, however, is different. The applicant need not prove the *reason* for torture, nor that she has a well-founded fear of it, but that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(1), (2). Because there is no subjective component for granting relief under the CAT, the adverse credibility determination on which the IJ relied to deny Camara's asylum claim would not necessarily defeat her CAT claim. Aside from Camara's own testimony, she provided independent evidence from which to conclude that it was more likely than not that she would be tortured upon her return to Guinea. She provided State Department country reports showing that the

Guinean government engages in torture of prisoners and brutal repression of the political party of which Camara is a member—reports that courts have recognized as important in determining whether an alien is entitled to relief under the CAT. *See Zubeda v. Ashcroft,* 333 F.3d 463, 475 (3d Cir.2003); *Kamalthas v. INS,* 251 F.3d 1279, 1283–84 (9th Cir.2001). She also presented the testimony of a psychologist with experience evaluating torture victims, who concluded with certainty that Camara had been tortured in the past. Finally, Camara presented documentary evidence that she had escaped from prison and was now wanted by the police. A currently outstanding warrant states that Camara should be "apprehended" and taken to the Central Prison in Conakry. Thus, we agree with Camara that the IJ's adverse credibility determination was insufficient to support the legal conclusion that Camara was ineligible for relief under the CAT.

Moreover, in not considering all the evidence relative to Camara's CAT claim, the IJ failed to follow the INS's own regulations for assessing such claims, which provide that "all evidence relevant to the possibility of future torture shall be considered, including ... [e]vidence of past torture inflicted on the applicant; ... evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and [o]ther relevant information regarding conditions in the country of removal." 8 C.F.R. § 208.16(c)(3). Explicitly basing her conclusion *solely* on the adverse credibility determination, the IJ failed to address "all evidence relevant to the possibility of future torture."

Our conclusion that the CAT has a standard independent from the standard for determining an asylum claim is consistent with the holdings of other courts of appeals, all of which have held that an adverse credibility determination cannot alone preclude protection under the CAT:

> Because the INS's regulations require it to consider all relevant evidence of the possibility of torture, and the CAT and asylum analyses focus on different elements and therefore must be treated independently, we hold that the INS may not deny an alien's CAT claim solely on the basis of its determination that the applicant's testimony is not credible.

*Ramsameachire v. Ashcroft,* 357 F.3d 169, 184 (2d Cir.2004); *see also Zubeda,* 333 F.3d at 476 (3d Cir.); *Kamalthas,* 251 F.3d at 1284 (9th Cir.); *Mansour v. INS,* 230 F.3d 902, 908 (7th Cir.2000). Of course, this assumes that the applicant has presented other evidence to support her claim.

For the foregoing reasons, we also vacate the IJ's denial of Camara's claim for relief under the CAT and remand for further consideration.

Because of the nature of the rulings that we have vacated, we recommend that the BIA recommend that the Chief Immigration Judge schedule this case on remand before a different IJ. *Cf. Georgis v. Ashcroft,* 328 F.3d 962, 970 (7th Cir.2003).

*VACATED AND REMANDED*