UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 04-2328

AZIZA SEID SALAH,

Petitioner,

versus

ALBERTO R. GONZALES, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals. (A95-230-224)

Argued: September 20, 2005          Decided: November 4, 2005

Before WILKINSON and WILLIAMS, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Petition denied by unpublished per curiam opinion.

**ARGUED:** Thomas Hailu, Arlington, Virginia, for Petitioner. Theodore Mark Cooperstein, UNITED STATES DEPARTMENT OF JUSTICE, Office of the Deputy Attorney General, Washington, D.C., for Respondent. **ON BRIEF:** Peter D. Keisler, Assistant Attorney General, Civil Division, M. Jocelyn Lopez Wright, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIUM:

Aziza Seid Salah, a native and citizen of Ethiopia, petitions for review of a final order of the Board of Immigration Appeals (BIA) affirming an immigration judge's (IJ) decision denying her application for asylum under 8 U.S.C.A. § 1158(b) (West Supp. 2005), for withholding of removal under 8 U.S.C.A. § 1231(b)(3) (West Supp. 2005), and for relief under the United Nations Convention Against Torture (CAT). The IJ denied Salah's claims based on a finding that her testimony was not credible. Because the IJ's decision and the BIA's affirmance were neither manifestly contrary to the law nor an abuse of discretion, we deny the petition for review.

I.

Aziza Seid Salah entered the United States on October 20, 2001 as a nonimmigrant visitor authorized to remain in the country no longer than six months. On May 2, 2002, the Immigration and Naturalization Service (INS)[1] served Salah with a Notice to Appear charging her as subject to removal because she remained in the United States longer than permitted. Salah responded by filing a Form I-589 with the INS on August 30, 2002, seeking asylum and

---

[1]Although the Immigration and Naturalization Service was the name of the agency when the Notice to Appear was filed, the agency has since been renamed and its functions have been transferred to the Department of Homeland Security. See 6 U.S.C.A. § 291 (West Supp. 2005).

withholding of removal based on her membership in the Oromo ethnic group and her political opinion. Salah also sought protection under Article 3 of the CAT. The INS referred Salah's application to the Immigration Court for hearing.

At her hearing, Salah testified -- through an interpreter -- that she was an ethnic Oromo and had participated in the Oromo Liberation Front (OLF). Oromos are the largest ethnic group in Ethiopia, making up approximately thirty-five percent of the population. According to the OLF, however, they have long been politically and economically marginalized by Ethiopia's ruling parties.

According to Salah, her father was abducted in 1992 from his home in Ethiopia because of his involvement with the OLF. She testified that she had not seen her father since, believing that he must have been killed. After her father's disappearance, Salah said she began to help the OLF in a limited way by undertaking such tasks as distributing pamphlets. It was because of her connections to the OLF, Salah believed, that the Ethiopian government first arrested her in 1995. She said that while she was detained for two weeks she was beaten, sexually assaulted, and denied medical care. She believed she was released only because her uncle paid a bribe.

After her release and with the help of her uncle, Salah left Ethiopia for Saudi Arabia in 1995 and obtained work as a housemaid. Salah claimed that her life in Saudi Arabia was difficult, as she

3

was abused by her employer there, a man she believed to be related to the Saudi royal family. She also testified that her employer misplaced her passport in Saudi Arabia, but she was issued a new one by the Ethiopian embassy. According to Salah, while in Saudi Arabia, she married -- by long distance proxy -- an Ethiopian man from her hometown.

In 2001, Salah returned to Ethiopia. She testified that she returned in order to visit her new husband and her ailing mother. Although she claimed that the government would not still be looking for her after seven years, she also testified that she feared she would be captured if she returned to her mother's house. Upon arriving in Ethiopia, Salah testified that she learned that her husband had been arrested the week before she arrived. According to Salah, her husband's arrest enraged her and caused her to say unfavorable things about the Ethiopian government. Because of those statements, Salah believed that the authorities came and arrested her again at her mother's house. She testified that she was kept in prison for seven days and was once again physically beaten.

Salah further explained that while in detention in 2001, she was visited by numerous people, including Mr. Mohammed Ali and Mr. Gashew Kersima, both of whom testified at her asylum hearing. Salah testified that Ali visited her once in prison and that this prison visit was the only time she ever met him. Ali, on the other hand, testified that he visited Salah twice, once in jail and once

4

again at her mother's house after her release, although Salah claimed that she never returned to her mother's house. Kersima's testimony also conflicted with Salah's story. Salah said that she came to the United States in 2001 with her Saudi employer, but Kersima testified that he and Salah had made plans to travel together to the United States and that the arrangement was her idea. According to Kersima, Salah never mentioned her employer. He said that he was not aware that Salah was traveling with anyone else, although, in her written application, Salah claims she traveled with her employer and spent five days with him in Washington, D.C. before finally escaping his dominion. Kersima, on the other hand, testified that Salah was alone at the airport once they arrived in Washington, and she calmly told him that she did not need transportation because someone was coming to pick her up.

At the conclusion of the hearing, the IJ issued an oral opinion denying Salah's claims, finding that the inconsistencies in the record "tainted the credibility of the entire claim." (J.A. at 41.) The IJ stated that the truth of Salah's case was uncertain and that uncertainty was Salah's own fault. After making this adverse credibility determination, the IJ determined that she also could not give great weight to Salah's independent evidence, and accordingly, the IJ denied Salah's applications for asylum, withholding of removal, and protection under the CAT. Salah appealed to the BIA, but the BIA affirmed the IJ's decision without

opinion.  See 8 C.F.R. § 1003.1(e)(4) (2005).  Salah then filed this petition for review.

## II.

Congress invested the Attorney General with the discretion to confer asylum on "refugees," 8 U.S.C.A. § 1158(b), and defines a "refugee" as a person unwilling to return to her native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C.A. § 1101(a)(42)(A). An applicant who shows past persecution on account of a protected ground is presumed to have a well-founded fear of future persecution.  See 8 C.F.R. § 1208.13(b).  An applicant can also establish a well-founded fear of persecution via persuasive testimony and credible, objective evidence.  See Huaman-Cornelio v. Bd. of Immigration Appeals, 979 F.2d 995, 999 (4th Cir. 1992). Because credible evidence is needed to prove a well-founded fear of persecution, an unfavorable credibility determination will often be fatal to an asylum claim unless the applicant can independently prove past persecution.  Rusu v. INS, 296 F.3d 316, 323 (4th Cir. 2002).

The Attorney General has designated that requests for asylum be submitted to an IJ and appealed to the BIA.  Because the BIA affirmed this case without opinion, we consider the IJ's order the

6

"final agency determination." 8 C.F.R. § 1003.1(e)(4); <u>Camara v. Ashcroft</u>, 378 F.3d 361, 366 (4th Cir. 2004) (noting that under the streamlined process, we "review the IJ's decision for the reasoning"). Accordingly, we must uphold the IJ's determination that Salah is ineligible for asylum unless that determination is "manifestly contrary to the law and an abuse of discretion." 8 U.S.C.A. § 1252(b)(4)(D); <u>Ngarurih v. Ashcroft</u>, 371 F.3d 182, 188 (4th Cir. 2004).

BIA and IJ determinations concerning asylum are conclusive "if supported by reasonable, substantial, and probative evidence on the record considered as a whole." <u>INS v. Elias-Zacarias</u>, 502 U.S. 478, 481 (1992). This substantial evidence review is "most narrow." <u>Lopez-Soto v. Ashcroft</u>, 383 F.3d 228, 234 (4th Cir. 2004). In fact, the agency's decision will be upheld unless Salah can "show that the evidence [s]he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." <u>Elias-Zacarias</u>, 502 U.S. at 483-84. Accordingly, simply because it may be possible to arrive at a different finding on the evidence, this does not mean that the agency's finding was not supported by substantial evidence. Instead, Salah must show that the evidence she put forward would have "compelled" the finding she seeks. <u>See</u> 8 U.S.C.A. § 1252(b)(4). As exceedingly broad as our deference is, however, it is not absolute. An IJ "who rejects a witness's positive testimony because in his or her

7

judgment it lacks credibility should offer a specific, cogent reason for his disbelief." Figeroa v. INS, 886 F.2d 76, 78 (4th Cir. 1989) (internal quotations and alterations omitted).

### A.

Salah argues that the IJ erred in making an adverse credibility determination because (1) credible evidence proves that Salah's testimony was in fact plausible and internally consistent, and (2) even if there were inconsistencies in Salah's testimony, they were trivial and immaterial.

With respect to Salah's first argument, the IJ, in her oral opinion, noted a number of inconsistencies involving Salah's testimony, her supporting evidence, and witness testimony. First, the IJ noted that although Salah claimed her fear of the government kept her from visiting her mother's house during her 2001 reentry, she later testified that she was arrested while at her mother's house. Second, Salah testified that the only time she saw Ali while in Ethiopia was when he visited her in jail. Ali, however, said that he actually saw her twice, and the second time was at her mother's house -- the same house Salah claimed she would not visit because of her fear of arrest. Third, Kersima testified that he traveled with Salah to the United States at her request. Salah's statement, however, told quite a different story. She claimed that she traveled to the United States with her employer and was

8

subsequently able to liberate herself from his control by escaping with the help of a fellow Oromo taxi driver. These three inconsistencies alone support the IJ's conclusion that Salah's testimony and the evidence she offered were not always plausible and internally consistent.

Salah, however, argues that even if we recognize these inconsistencies, we must also find that they are too minor and trivial to support an adverse credibility determination. Salah relies on a string of Ninth Circuit cases for the proposition that "[a]dverse credibility determinations based on minor discrepancies, inconsistencies, or omissions that do not go to the heart of the applicant's asylum claim cannot constitute substantial evidence." E.g., Chen v. INS, 266 F.3d 1094, 1098 (9th Cir. 2001), vacated on other grounds by 537 U.S. 1016 (2004); see also Bojorques-Villanueva v. INS, 194 F.3d 14, 16 (1st Cir. 1999) (stating that "an adverse credibility determination cannot rest on trivia").

The trouble with Salah's argument, however, is that the IJ's adverse credibility finding did not come down to a few minor inconsistencies. The IJ did not base her decision on any single trivial inconsistency that was "merely incidental" to Salah's asylum claim. See Camara, 378 F.3d at 369 (noting that the IJ put too much importance on conflicting evidence that the applicant had attended "meetings" as opposed to "demonstrations"). The three inconsistencies detailed above all relate directly to Salah's

9

testimony concerning her purported 2001 arrest as well as the details of her 2001 escape from Ethiopia. They relate directly to her claimed persecution and cannot be dismissed as "[m]ere trivial errors or inconsistencies, incidental to the asylum claim or attributable to errors of language." Br. of Petr. at 18; see also Vilorio-Lopez v. INS, 852 F.2d 1137, 1142 (9th Cir, 1988) (noting that minor inconsistencies "such as discrepancies in dates . . . are not an adequate basis for an adverse credibility finding").

Moreover, the IJ examined Salah's testimony as a whole and found that the cumulative effect of her gross inconsistencies presented a case that was not credible. The IJ found that because of Salah's unconvincing evidence, she was unsure of "what is true about this case and what is not," and the end result was that the IJ could not determine what actually happened to Salah while she was in Ethiopia. (J.A. at 41-42.) We must pay great deference to an IJ's determination of witness credibility because only the IJ is able to personally consider and observe that testimony. See Ruso, 296 F.3d at 323. Accordingly, "an IJ's ability to judge a petitioner's credibility and demeanor plays a pivotal role in an asylum determination; an unfavorable credibility determination is likely to be fatal to such a claim." Id.

In Salah's case, the IJ remained confused as to what really happened to Salah in Ethiopia and the question of whether she possessed an actual fear of persecution was equivocal at best. The

IJ found that the chief reason for the ambiguity was that Salah's own testimony was not credible.

Recognizing that Salah's testimony was not always consistent, the inconsistencies were not minor and incidental to her claim, and the IJ was in the best position to judge Salah's overall credibility, we find that there was substantial evidence on which the IJ could support her adverse credibility determination. See Camara, 378 F.3d at 369 (finding that the mixed evidence did not compel a conclusion that the applicant's "testimony was entirely reliable"). In short, Salah failed to show that her evidence "was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." Elias-Zacarias, 502 U.S. at 483-84.

B.

Placing aside our affirmance of the IJ's adverse credibility determination, Salah is still entitled to asylum if she can prove actual past persecution. See 8 C.F.R. § 208.13(b) (stating that an applicant can "qualify as a refugee" if "she has suffered past persecution"). Salah argues that she presented sufficient corroborating evidence showing that she was subjected to past persecution.

The IJ, however, considered Salah's independent evidence but did not afford the majority of it any significance. For example, the IJ considered letters from Salah's family members in Ethiopia,

11

but did not grant them much weight because they were unsworn.  The IJ also considered a letter from the OLF that indicated that Salah was a member.  That letter, while detailing the OLF's struggles with the Ethiopian government, does not go so far as to claim that Salah was a victim of past persecution.[2]  Accordingly, the IJ recognized that the document was useless in terms of corroborating Salah's specific claims of past persecution.  Salah also presented a document appearing to be a police summons, but again, the document was in no way authenticated and the IJ gave it no weight.[3]

Moreover, the circumstantial evidence in this case actually cuts against a finding of past persecution.  Salah was able to obtain a passport and leave Ethiopia in both 1995 and 2001, while also being allowed to reenter the country in 2001.  She testified that she was imprisoned and abused by the Ethiopian government, but she also said that she was visited by many friends and family members while imprisoned.  She voluntarily returned to Ethiopia in

---

[2]There is, in fact, some question as to whether Salah is actually of Oromo ethnicity.  Nothing on her birth certificate or her passport indicated that she was Oromo, and the IJ found no persuasive evidence in the record to indicate her actual ethnicity. Nonetheless, we, like the IJ, grant Salah the benefit of the doubt and assume her ethnicity to be Oromo.

[3]One document the IJ did not address in her oral opinion is an October 11, 2001 medical certificate presented by Salah, which claims that she was diagnosed with multiple posttraumatic hematoma. The trouble with this document, however, is that although it offers evidence that Salah was hurt, it says nothing about why she was hurt or who hurt her. Without some credible, linking evidence, it is impossible to connect her purported injuries to past persecution.

12

2001, even after claiming that she was first persecuted there in 1995. See Ngarurih, 371 F.3d at 189 (holding that evidence that an asylum applicant returned to his country is relevant as to whether the applicant was "unable or unwilling to return to his home country due to a well-founded fear of persecution"). Finally, Salah did not seek asylum in this country until after her visa expired and she was served with notice of removal. All of this circumstantial evidence counsels against a finding of ethnic and political persecution by the Ethiopian government. Considering the record as a whole, we therefore conclude that the IJ's determination against asylum was supported by substantial evidence.

III.

Having determined that substantial evidence supports the IJ's denial of asylum, we turn to Salah's requests for withholding of removal and withholding under the Convention Against Torture.

In order to show that she is entitled to withholding of removal, Salah must establish that her "life or freedom would be threatened in [Ethiopia] because of [her] race, religion, nationality, membership in a particular political group, or political opinion." 8 U.S.C.A. § 1231(b)(3)(A). This standard requires a higher showing of proof than does an asylum claim, although the facts that must be proved are the same. Camara, 378 F.3d at 367. Accordingly, an applicant "who is ineligible for

13

asylum is necessarily ineligible for withholding of removal under § 1231(b)(3)." Id. We therefore deny Salah's claim for withholding of removal.

Finally, Salah's CAT claim is not properly before this Court. Salah failed to make this argument before the BIA when she initially appealed the IJ's decision. We therefore have no jurisdiction to consider this argument because Salah failed to exhaust "all administrative remedies." See 8 U.S.C.A. § 1252(d); Asika v. Ashcroft, 362 F.3d 264, 267 n.3 (2004) (holding that we lack jurisdiction when claimants fail to exhaust all administrative remedies). Moreover, although the issue is listed on Page 1 of Salah's brief to this Court, Salah abandoned the issue because not one argument concerning the CAT appears in her brief. See Fed. R. App. P. 28(a)(9)(A); 11126 Baltimore Blvd., Inc. v. Prince George's County, MD, 58 F.3d 988, 993 n.7 (4th Cir. 1995) (en banc) (declining to address issues that the litigant "failed to brief or argue").

IV.

For the foregoing reasons, we conclude that the IJ's decision to deny asylum and withholding of removal was not manifestly contrary to the law. The petition for review is therefore denied.

PETITION DENIED

14