**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 05-1571**

DJOMADJI TOUGOUE GERVAIS,

Petitioner,

versus

ALBERTO R. GONZALES, U.S. Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.  (A95-223-492)

Argued:  September 20, 2006          Decided:  November 8, 2006

Before KING and DUNCAN, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Petition for review granted and case remanded by unpublished per curiam opinion.

**ARGUED:**  Jacqueline Emanga Ngole, Rockville, Maryland, for Petitioner.  Mark Anthony Exley, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Respondent.  **ON BRIEF:** Paul J. McNulty, United States Attorney, Alexandria, Virginia, for Respondent.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Djomadji Tougoue Gervais (Gervais), a french speaking native and citizen of Cameroon, petitions for review of an April 29, 2005 order by the Board of Immigration Appeals (the Board) affirming the immigration judge's denial of his application for political asylum under 8 U.S.C. § 1158(b) and for withholding of removal under 8 U.S.C. § 1231(b)(3). Gervais also contends that he adequately raised before the Board the immigration judge's failure to grant him relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), as implemented by § 2242 of the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, Div. G, 112 Stat. 2681-82 (Oct. 21, 1998), but that the Board failed to address his CAT claim. For the following reasons, we vacate the Board's April 29, 2005 order and remand for further proceedings consistent with this opinion.

I.

Gervais, currently thirty-two years old, arrived in the United States on December 8, 2000 pursuant to a nonimmigrant visitor visa, which he obtained through misrepresentation. In order to obtain the visa, Gervais falsely certified that he was part of a musical group scheduled to perform in the United States. He overstayed his visa, which expired on December 29, 2000, and filed a timely

application for asylum and withholding of removal based upon his political views. The Immigration and Naturalization Service, now the Department of Homeland Security, denied the application and charged Gervais as a removable alien for overstaying his visa. Gervais conceded removability, but continued to pursue his claims for asylum and withholding of removal. He also sought deferral of removal under CAT. Gervais' case was referred to an immigration judge.

A.   Evidentiary Hearing Before Immigration Judge

On March 12, 2003, the immigration judge (the IJ) held an evidentiary hearing on the merits of Gervais' three claims. The IJ received the following as documentary evidence:   (1) Gervais' application for asylum and withholding of removal, which application included an attached written statement by Gervais[*]; (2) the State Department's 2001 Country Report on Human Rights Practices for Cameroon; (3) a five-page affidavit sworn to by Gervais on March 12, 2003; (4) a document dated February 12, 2000 and titled "Medico-Legal Certificate #0214827," (J.A. 44); (5) a letter to Gervais from his brother dated November 3, 2001; (6) a letter to Gervais from his friend Firmin dated December 11, 2001; (7) a newspaper article dated January 29, 2002; (8) Gervais' passport; (9) his visa to the United States; and (10) a March 1998

---

[*]Gervais submitted the statement with his application unsworn. As best we can tell, Gervais swore to the same statement before the IJ on March 12, 2003.

State Department Report entitled "CAMEROON – PROFILE OF ASYLUM CLAIMS & COUNTRY CONDITIONS," (J.A. 57).

In his March 12, 2003 affidavit, Gervais stated that he secretly joined the political opposition party named the Union of Cameroon Democratic Forces (UCDF) in March 1998. He claimed to have been very active in the youth activities of the UCDF, including being elected the assistant secretary in charge of communications in July 1999. Notably, Gervais did not mention UCDF in his original application for asylum and withholding of removal nor in his attached statement.

Gervais also testified at the March 12, 2003 hearing. Specifically, Gervais testified that, while attending the University of Douala to obtain his bachelor of law degree, he participated in a student strike on January 27, 2000 which resulted in his arrest by the local police and detention in a small cell at the central police station for two days. Gervais testified that he was kicked and beaten throughout the time he was detained. He further testified that he was released after two days "because of the pressures because everybody was talking about, about it. The press, the non-governmental agencies, the radio, but also me because I was very injured." (J.A. 8). According to Gervais' testimony, after his release, he went to La Quintinie Hospital "right away," (J.A. 9), where he was treated for four days due to injuries to his small finger, back, tibia and feet. Gervais

- 4 -

testified that "after [he] left the hospital a military person was walking there.  He told me continue like this.  You're going to see what's going to happen to you."  Id.

Gervais testified that, after approximately three months, he felt well enough to return to the University of Douala and his political activism on campus.  But, according to Gervais, he received threats from anti-gangs, which he described as secret police in plain clothes who had infiltrated the campus and knew him.  He believed his problems became worse "because they realized that I was a militant in the party."  (J.A. 11).

After obtaining his bachelor of law degree, Gervais applied in October 2000 for admission into the master of law degree program at the University of Douala, but was rejected.  According to Gervais' testimony, he and similarly situated students tried to organize a strike "to let everybody know, the press, the students, everybody . . . they . . . kicked us off the university without any valid reason . . . ."  (J.A. 13).  However, Gervais testified that, during the planning stages of the strike, on October 30, 2000, "two anti-gangs came to pick me up at my studio" near campus.  Id.  He testified that he was then taken to a police station near campus where he was beaten twice a day for four days until he escaped. Gervais testified that, during the beatings, the police officers told him he would die if he continued membership in the UCDF.

Following his escape, Gervais traveled by public bus to the city of Bafang, Cameroon where his parents lived. Gervais testified that, on November 20, 2000, he participated in a political protest march in Bafang, which march was held by UCDF and other parties "to denounce the practices of the operational commandments." (J.A. 18). Gervais testified that the anti-gangs noticed him in the protest march. Gervais next testified that on November 22, 2000, the anti-gangs seized him from his parents home and took him to their headquarters brigade in Bafang where they beat him almost the whole day. In describing how he was beaten, Gervais testified:

> Back of the feet, that's where they begin. They asked me to stand up. I could not stand up. They started to beat me in the buttocks. They asked me to sit down. Impossible. They continue to beat me up. Then they, they put me on the balancoir or swing. They tied my, both my hands and they hanged me down, suspended there for about half an hour.

(J.A. 19-20). Gervais next testified that, because he had diarrhea and a fever, the secret police officers took him to a hospital in Bafang.

Within a few hours, Gervais' father was able to remove him from the hospital and take him to a hospital twenty-minutes away in Kekem, where he stayed for six days. Gervais testified that, meanwhile, his Uncle Michel had arrived from the United States and "he infiltrated me within a music group which was coming to the U.S." (J.A. 21).

- 6 -

B.    March 12, 2003 Oral Decision of the IJ

In her March 12, 2003 decision entitled "ORAL DECISION OF THE IMMIGRATION JUDGE," the IJ concluded:

> Accordingly, we find that the respondent has not presented a convincing story.  We deny his applications for asylum and withholding of removal, and relief under the Torture Convention because we are not convinced of his credibility.

(J.A. 73).   The adverse credibility determination was based upon the following eight separate and specific factors articulated by the IJ:

1.    The IJ found that it was not until the March 12, 2003 merits hearing that Gervais provided evidence that the reason he could not register for his master of law degree from the University of Douala was related to his involvement with UCDF.  According to the IJ:  "This is a very significant embellishment which casts serious doubt on the credibility of [Gervais'] testimony."  (J.A. 69).

2.    The IJ found that Gervais' account of his January 2000 arrest and release in his statement accompanying his application for asylum and withholding of removal was not entirely consistent with his later account given in his later separate sworn affidavit.   In this regard, the IJ stated: "According to the earlier version, he was released on January 29 at 9 p.m. because his shirt was stained with blood. . . .   In the later version, he

- 7 -

states that pressure from press and human rights organizations was responsible for his release . . . ." (J.A. 70).

3. The IJ found that the document dated February 12, 2000 and titled "Medico-Legal Certificate #0214827," (J.A. 44), was inconsistent with Gervais' testimony as to when he was released from the hospital. The IJ found that, based upon the time line provided by Gervais in his testimony, the document should have been dated February 3 or 4, 2000.

4. The IJ also found that Gervais' accounts of his November 2000 arrest differed between the statement accompanying his application for asylum and withholding of removal and his later in time affidavit. According to the IJ: "In the earlier version . . . , he states that he was 'invited to go to Bafang in order to certify my signature at the Bafang courthouse' and tried to run away while under guard at the courthouse, but then ended up in the hospital. In the later version, he states 'I was arrested at my house by three officers driving a government car. We had some misunderstanding relating to a signature that I was supposed to pose on a document I did not recognize.'" (J.A. 70-71).

5. Gervais obtained his visa through misrepresentation by falsely certifying that he was part of a musical group scheduled to perform in the United States when, in fact, he was not a musician.

6. Gervais failed to present his uncle as a witness at the evidentiary hearing, when he could have provided corroboration. In this regard, the IJ specifically stated: "[Gervais] has an uncle in the United States who had the same problems as he did in Cameroon and was granted asylum. [Gervais] did not invite that uncle to come to the Court as a witness for him." (J.A. 71).

7. A newspaper article that Gervais presented contradicted Gervais' testimony. According to the IJ: "The newspaper article states that he had disappeared and that his family was very worried about him. The family is concerned about whether he has committed suicide or met an accidental death. . . . [Gervais'] explanation for this story, which does not seem to accord with his own account, is that only close family members knew about where he had gone or that he had left Cameroon. However, [Gervais] claims that his arrangements for his departure were arranged by his father with the assistance of an uncle. He states 'during a family reunion it was decided that my future was no longer in Cameroon . . . .' Thus, we have a major inconsistency here." (J.A. 71-72).

8. Gervais was able to depart Cameroon through an official exit point. "The [Petitioner] was able to leave Cameroon without any problem. He went through exit control at the airport in Cameroon." (J.A. 72-73).

C. The Board's First Order

Gervais timely appealed the IJ's adverse decision to the Board. On August 7, 2003, the Board ordered the record returned to the IJ for the IJ to take appropriate action to certify to the Board that the record was complete. The Board took this action because its review of the record of the proceedings before the IJ revealed "that a portion of testimony of the hearing and a portion of the order on the Immigration Judge's oral decision is missing." (J.A. 86).

D. February 25, 2004 Written Decision of the IJ/Order of Certification

On February 25, 2004, the IJ issued a decision entitled "WRITTEN DECISION OF THE IMMIGRATION JUDGE" and "ORDER OF CERTIFICATION." (J.A. 148). In this decision, the IJ certified that she had reviewed her March 12, 2003 Oral Decision and the transcript of the hearing conducted the same day and had made corrections to both. She then expressly certified that the corrections made to such decision and transcript were correct.

The IJ also noted that Gervais sought to admit into evidence a package of documentary evidence at the hearing before her on remand. The IJ refused to admit the documents on the ground that the Board's limited remand to complete the record did not reopen Gervais' immigration proceedings to permit the submission of new evidence. On the question of whether Gervais' package of documentary evidence would satisfy the standard for granting a

motion to reopen proceedings, the IJ answered no. Specifically, the IJ stated:

> A motion to reopen may be granted when there is new material evidence that could not have been submitted at the original hearing. We note that all of the evidence submitted in the new package is evidence that predates the date of the hearing in this case, March 12, 2003, other than the U.S. State Department Human Rights Report for Cameroon for 2002 which was printed on March 31, 2003. In reviewing the State Department report for 2002, we note that the portions underlined or starred by [Gervais] either repeat language from the 2001 report or reference matters that are not directly related to [Gervais'] claim. Thus, [Gervais] has not established that he is seeking to submit any evidence that was unavailable or could not have been submitted at the original hearing. Accordingly, this evidence does not comport with the type of evidence for which a motion to reopen may be granted.

(J.A. 150).

### E. The Board's Order Following Remand

Gervais timely appealed the IJ's February 25, 2004 decision to the Board. Notably, although Gervais listed his CAT claim in his notice of appeal, he did not expressly address such claim in his appeal before the Board except to briefly mention it in one sentence on page sixteen of his thirty-one page brief before the Board and then again in the final sentence of the same brief. Specifically, in the second full paragraph on page sixteen of his brief before the Board, Gervais states: "Similarly, Respondent is eligible for withholding under both 8 U.S.C. § 1231(b)(3) and the Torture Convention." (J.A. 174). The final sentence of the same brief states: "For the foregoing reasons, the decision below

should be reversed and Respondent granted asylum pursuant to 8 U.S.C. § 1158 and, in the alternative, withholding of removal pursuant to 8 U.S.C. § 1231(b)(3) and the Convention Against Torture." (J.A. 189). Here, we note that in his appellate brief before this court, Gervais states that he "did not raise the CAT claim before the Board." (Gervais' Br. at 14).

On April 29, 2005, the Board issued a two-page order (the Board's Second Order), which lists Gervais as applying for relief only from the IJ's denial of his claims for asylum and withholding of removal. Ultimately, the Board held that the IJ's decision denying Gervais' applications for asylum and withholding of removal based upon her adverse credibility determination was "supported by the record." (J.A. 156). According to the Board, "[t]he inconsistencies and omissions cited by the Immigration Judge are present in the record and provide cogent reasons upon which to base an adverse credibility determination." Id. The Board also specifically addressed two of the inconsistencies found by the IJ. First, the Board specifically identified what it considered inconsistencies concerning Gervais' January 2000 arrest:

> [I]n [Gervais'] first asylum application, he stated that he was released from detention on January 29, 2000, at 9 p.m. because the Cameroonian authorities discovered that his shirt was stained with blood. . . . However, in his second written asylum attachment, submitted during his proceedings, [Gervais] stated that he was released from detention on January 29, 2000, due to pressure from the media and human rights organizations and was taken to the hospital for 4 days.

- 12 -

(J.A. 156). The Board also specifically identified what it considered inconsistencies concerning Gervais' November 2000 arrest:

> [I]n his first asylum application, he stated that in November 2000 he was invited to go to Bafang in order to certify his signature on a document at the Bafang Courthouse where he was warned by a stranger to try and get away from the men accompanying him. . . . According to [Gervais], he tried to run away, but ended up in the hospital. . . . In contrast, [Gervais] stated in his second attached statement that he was arrested at home in November 2000 by several officers driving a government vehicle. . . . [Gervais] stated that he had a "misunderstanding" with the officers regarding a signature he was supposed to put on a document that he did not recognize. . . . [Gervais] stated that he was beaten and taken to a hospital when he refused to sign.

(J.A. 157). The Board concluded: "Under these circumstances, we find that the inconsistencies between [Gervais'] claims are significant and go to the heart of his claim for relief." Id.

Gervais filed a timely petition for review of the Board's Second Order. Gervais seeks review of the Board's rejection of his asylum and withholding of removal claims and the IJ's rejection of his CAT claim.

II.

The posture of this appeal presents the threshold issue of whether Gervais has exhausted his administrative remedies with respect to his CAT claim, as our ability to review the merits of such claim is conditioned upon Gervais having exhausted all of his administrative remedies as of right. See 8 U.S.C. § 1252(d)(1) ("A

court may review a final order of removal only if . . . the alien has exhausted all administrative remedies available to the alien as of right."). Unfortunately, the record on this issue is so unclear that we cannot resolve it absent a remand to the Board. One, the Board's Second Order, from which the instant appeal is taken, nowhere mentions Gervais' CAT claim. Two, although Gervais lists his CAT claim in his second notice of appeal to the Board, the appellate brief which Gervais submitted to the Board in support of his appeal makes only scant reference to his CAT claim. Thus, from the record as it currently stands, we cannot discern whether the Board even understood Gervais as challenging the IJ's denial of his CAT claim in his appeal before the Board. Accordingly, we vacate the Board's Second Order and remand this case to the Board with instructions that the Board determine whether Gervais sufficiently raised his CAT claim before the Board in order to have preserved it for appellate review before the Board.

If the Board concludes on remand that Gervais sufficiently raised his CAT claim before the Board in order to have preserved it for appellate review before the Board, we instruct the Board to remand the case back to the IJ for a reevaluation of her credibility determination regarding Gervais with respect to his asylum claim, his withholding of removal claim and his CAT claim. While the IJ's adverse credibility determination(s) appear to be supported by substantial evidence in the record, when considering

the documentary evidence before the IJ at the March 12, 2003 evidentiary hearing, which documentary evidence the IJ appears not to have considered, we have concerns as to the impact of this evidence on the IJ's credibility determination(s) regarding Gervais. We instruct the IJ to expressly consider the documentary evidence before her at the March 12, 2003 evidentiary hearing in reevaluating her credibility determination(s) of Gervais. <u>See</u> <u>Camara v. Ashcroft</u>, 378 F.3d 361, 369-71 (4th Cir. 2004).

Alternatively, if the Board concludes on remand that Gervais did not sufficiently raise his CAT claim before the Board in order to have preserved it for appellate review before the Board, we instruct the Board to remand the case back to the IJ for a reevaluation of her credibility determination regarding Gervais only with respect to his asylum claim and his withholding of removal claim. Under this scenario, the IJ would not be at liberty to revisit the CAT claim. Again, the IJ should expressly consider the documentary evidence before her at the March 12, 2003 evidentiary hearing in reevaluating her credibility determination(s) of Gervais. <u>See</u> <u>id.</u>

If, on remand before the IJ, the IJ still renders a decision adverse to Gervais, Gervais could then appeal the case back to the Board. On appeal before the Board following our directed remand to the IJ, if the Board had previously concluded that Gervais had not preserved his CAT claim before the Board, the Board would not need

to address Gervais' CAT claim further.  If, however, the Board had previously concluded that Gervais had sufficiently raised his CAT claim before the Board, the Board could address that claim and the asylum and withholding of removal claims conditioned, of course, upon Gervais complying with all procedural and substantive rules and regulations pertaining to appeals before the Board.

In conclusion, we vacate the Board's Second Order and remand this case to the Board with instructions to carry out the detailed instructions we have just set forth.

<u>PETITION FOR REVIEW GRANTED AND CASE REMANDED</u>