UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-1705

MOBOLAJI OLUFUNMILAYO AOKO,

Petitioner,

v.

ERIC H. HOLDER, JR., Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration
Appeals.

Argued: March 20, 2013              Decided: April 11, 2013

Before DAVIS and THACKER, Circuit Judges, and Mark S. DAVIS,
United States District Judge for the Eastern District of
Virginia, sitting by designation.

Petition denied by unpublished per curiam opinion.

**ARGUED:** Fatai A. Suleman, AMITY, KUM & SULEMAN, PA, Greenbelt,
Maryland, for Petitioner. Robert Michael Stalzer, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON
BRIEF:** Stuart F. Delery, Acting Assistant Attorney General,
Civil Division, Thomas B. Fatouros, Senior Litigation Counsel,
Office of Immigration Litigation, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Petitioner Mobolaji Olufunmilayo Aoko entered the United States in 1990 on a tourist visa. Aoko is a Nigerian citizen, but her 1991 application for Temporary Protected Status ("TPS") represented that she was Liberian. She argued that the misrepresentation was the work of an unscrupulous immigration practitioner, and she did not learn of it until her TPS interview (in which she admitted she was Nigerian). The Board of Immigration Appeals (the "BIA") rejected her explanation for the falsehood and held that she willfully misrepresented her citizenship and did not timely recant the misrepresentation. The BIA therefore concluded that she is inadmissible under § 212(a)(6)(C)(i) of the Immigration and Nationality Act (the "INA"), and thus ineligible to adjust her status to that of lawful permanent resident ("LPR"). We hold that substantial evidence supports the Board's findings and conclusions, and that we lack jurisdiction to hear Aoko's challenge to the denial of her application for a waiver of inadmissibility. Accordingly, we are constrained to deny Aoko's petition for review.

I.

A.

This case has a long and complicated procedural history. Because that history is central to the issues on appeal, we set it out in some detail.

2

Aoko, a native and citizen of Nigeria, entered the United States in November 1990 as a nonimmigrant visitor for pleasure. Though authorized to stay only until May 15, 1991, she remained in the country past that date. Under disputed circumstances, Aoko applied for TPS and employment authorization in October 1991 based on the false representation that she was Liberian. After she acknowledged in her December 1991 TPS interview that she was Nigerian, the Immigration and Naturalization Service (the "INS") served her with an Order to Show Cause. She then applied for asylum and withholding of removal based on religious persecution, i.e., by Muslims against Christians.

At the June 1993 asylum hearing, Aoko testified as follows.[1] In October 1991, a friend introduced her to a man in New York who said he was a lawyer. That man -- "Mr. Atitebi" -- told Aoko that "he would be able to change [her] status and get [her a] green card." J.A. 489, 490. Atitebi asked for $1,800 cash, though Aoko eventually paid only $1,500. Atitebi did not explain the basis on which he would get Aoko a green card; rather, he merely "asked for [her] name and [her] age and he asked [her] to

_____

[1] All hearings were conducted in English, without the aid of an interpreter in the Yoruba language; though an interpreter was offered, Aoko declined, stating, "I speak English fine." J.A. 437.

sign some papers." J.A. 493. On cross-examination, she testified about the TPS application as follows:

> Q. Did you read that form when you signed it ma'am?
> A. I did not read it.
> Q. But you signed it - -
> A. I signed it.

J.A. 521.

Aoko next heard from Atitebi in the first week of December 1991, when he sent a letter telling her to come to New York for an immigration interview later that month. She did so, picking up a packet of information from Atitebi's sister the night before the interview. Aoko opened the packet and was confused by the enclosed documents' references to Liberia. Among these documents was a "crib sheet" containing answers to basic questions about Liberia. J.A. 1217.

Aoko attended the interview later that month, bringing along the packet; it was this interview that brought her to INS's attention. At the beginning of the interview, the interviewer told Aoko "to tell [him] the truth about [her]self." J.A. 495. At that point, she understood that Atitebi had represented to INS that Aoko was Liberian. Aoko described the subsequent conversation as follows:

> I told him I am a Nigerian. I came in November 1990.
> He said he knew that a lot of people have been, been
> outside trying to deceive you that they can get green
> card for you. He knew they already took money from me
> to help me with this green card. So when I told him
> that was exactly what happened. That a man told me he

4

> would be able to help me to get a green card and he took some money from me and asked me to show up for the interview. I told him the truth.

J.A. 496.

In an oral decision on June 23, 1993, the Immigration Judge (the "IJ") denied the applications for asylum and withholding of removal, finding that Aoko was "not a credible witness." J.A. 1104.[2] Aoko appealed, and the BIA affirmed on November 25, 1998. She did not seek judicial review.

Aoko then retained another attorney, and in 2002 filed a motion to reopen based primarily on the existence of her two young children, born in 1995 and 1998, and the fact that one of them had severe asthma. On May 22, 2003, the BIA denied the motion to reopen as untimely, as it "would have been due on or before February 23, 1999." J.A. 1020.

Aoko then retained new counsel, and in August 2005 filed a motion to remand based on the allegedly ineffective assistance of two of her previous attorneys (both retained subsequent to Atitebi). Aoko's affidavit attached to the motion explained that on November 7, 1997, the first attorney received an approval

---

[2] The IJ pointed to instances where Aoko changed her story. Aoko first claimed that she had been raped after she was detained following a religious demonstration, but then retracted that statement. Additionally, she testified that she had been beaten so badly that she was hospitalized for two weeks, though this fact was omitted from her written asylum application.

5

notice for an immigrant worker petition that was filed on Aoko's behalf by her employer (Aoko had become a registered nurse while in the United States), but failed to file the appropriate motion with the BIA. Rather, Aoko asserted that the first attorney incompetently filed an application for adjustment of status with the INS, which the INS denied based on lack of jurisdiction. Aoko also asserted that the first attorney failed to notify Aoko of the BIA's 1998 dismissal of her appeal, and she did not become aware of that dismissal until around May 10, 2000. Regarding the second attorney, Aoko asserted that she retained him around June 30, 2000, but he did not file the proper motion to reopen with the BIA until December 30, 2002. Aoko also asserted that the second attorney failed to support the motion with the approved immigrant petition. Finally, Aoko asserted that the second attorney failed to inform her of the BIA's denial of the untimely motion.

On October 27, 2005, the BIA reopened proceedings sua sponte (as a motion to reopen would have been time-barred), finding that Aoko "suffered prejudice as a result of her former counsels' ineffective assistance." J.A. 823. The BIA noted that "it appears that [Aoko] is admissible to the United States for permanent residence . . . ." J.A. 823. It thus remanded to the IJ "solely for adjudication of her application for adjustment of status." J.A. 823.

6

B.

A new IJ held a hearing on May 16, 2006. The attorney for the government asserted that Aoko was "inadmissible for fraud or willful misrepresentation" based on the Liberia-based TPS application, and that a waiver of inadmissibility under INA § 212(i)[3] was therefore required before Aoko could adjust her status. J.A. 541. On cross-examination, Aoko testified inconsistently regarding the TPS application, first stating that she "did not read it" before signing it, and then testifying as follows:

> Q. Are you saying that you executed a document that was blank?
> A. No.
> Q. Did you read the document before you executed it?
> A. I did.
> Q. Did you see that it said Liberia?
> A. Yes.
> Q. And you executed it anyway?
> A. I did.

J.A. 556.

Nevertheless, the IJ granted Aoko's application for adjustment of status in an oral decision on May 16, 2006. The IJ noted that the BIA's 2005 decision stated that "it appears that [Aoko] is admissible to the United States for permanent

---

[3] Under this section, a noncitizen may obtain a discretionary waiver of inadmissibility due to fraud or willful misrepresentation where the inadmissibility would result in extreme hardship to a citizen or LPR spouse or parent of the noncitizen. 8 U.S.C. § 1182(i)(1).

7

residence," and that the Department of Homeland Security ("DHS") "filed nothing with [the IJ] or the Board following the Board's decision calling into question her admissibility." J.A. 424. The IJ then "concluded that there simply [was] not a sufficient showing that [Aoko] engaged in a willful misrepresentation of a material fact" such that she would be inadmissible under INA § 212(a)(6)(C)(i). J.A. 425.

DHS appealed the IJ's decision on June 14, 2006. On December 26, 2007, the BIA issued a decision remanding for further proceedings. The BIA first noted that its previous reference to Aoko's apparent admissibility "was merely a preliminary judgment made in the context of determining whether she was prima facie eligible for relief; it was not the 'law of the case' or an otherwise binding determination on her admissibility." J.A. 355. Second, the BIA relieved DHS of affirmatively charging Aoko with deportability, finding that because DHS had established her deportability by clear and convincing evidence, the burden had shifted to Aoko to offer evidence that would support an application for relief. Third, the BIA stated that the IJ's determination that Aoko's misrepresentation was not willful was "not supported by any of the important subsidiary factual determinations that must necessarily underlie such a conclusion," such as whether Aoko "had knowledge of the falsity of the information contained in

8

her TPS application." Id. Fourth, the BIA acknowledged Aoko's argument that even if she misrepresented her nationality when applying for TPS, she timely recanted the misrepresentation. J.A. 356. However, it determined that BIA decisions "have not applied any such timely recantation exception to inadmissibility determinations under 212(a)(6)(C)(i) of the Act," and thus the parties and the IJ were "free to explore whether it would be appropriate to expand the timely recantation principle to the inadmissibility context . . . ." Id.

After hearing arguments from the parties on December 15, 2008, the IJ delivered another oral decision. The IJ gave Aoko's 1993 testimony "somewhat less weight" because at that time she was represented by counsel later shown to be ineffective. J.A. 316. Nevertheless, the IJ found that (1) Aoko "did admit to having knowledge that [the TPS application] misrepresented her citizenship," and thus that the misrepresentation was willful; and (2) Aoko "ha[d] not demonstrated sufficiently that she timely withdrew the misrepresentation," which, the IJ noted, would have been "as soon as she got knowledge of the misrepresentation," taking "steps to correct" it. J.A. 317-18. Accordingly, the IJ indicated that Aoko would have to seek a waiver of inadmissibility under INA § 212(i) in order to continue to pursue adjustment of status.

Aoko applied for that waiver on May 13, 2009. In a hearing on the matter on June 30, 2009, Aoko and Aoko's LPR mother testified that Aoko's mother would suffer extreme hardship if Aoko were to be deported. The testimony focused on (1) Aoko's two young children, one of whom has severe asthma, and the prospect of Aoko's mother having to take care of them without Aoko; (2) Aoko's mother's high blood pressure and diabetes; and (3) the financial hardship that Aoko's mother would face were Aoko -- the family's only breadwinner -- deported. Aoko's mother also testified that she traveled to Nigeria for four to six months every two years.

The IJ issued a written decision and order on August 9, 2010, denying Aoko's waiver application and granting her voluntary departure but ordering her removed if voluntary departure conditions were not met. The IJ found that though "[t]here is no doubt that [Aoko's] mother would face significant hardship" were Aoko deported, "in particular from loss of income and companionship," Aoko did not "establish that her LPR mother would suffer extreme hardship as that term has been defined in the governing case law." J.A. 80. Regarding health, the IJ noted that though Aoko "was given the opportunity to provide additional documentary evidence" regarding her mother's medical conditions, "no additional evidence was provided." J.A. 80. Further, Aoko's mother had "apparently managed to stay in

10

Nigeria for extended periods of time without significant difficulties in terms of her health or otherwise." J.A. 80. Though the IJ noted that Aoko's "sons would face significant hardship" were Aoko removed, any hardship to them could not constitute a basis for the waiver. J.A. 80. Regarding economic hardship, which the IJ found was "the main factor in the case," the IJ found that it "was not a sufficient basis for a finding of extreme hardship in the absence of other significant equities." J.A. 81.

Aoko appealed, challenging the IJ's conclusions regarding (1) her knowledge of the misrepresentation in the TPS application; (2) whether she had timely recanted any misrepresentation; and (3) whether she had established that her LPR mother would face extreme hardship were Aoko deported. On May 2, 2012, the BIA issued a decision affirming each of the IJ's conclusions. Regarding Aoko's knowledge of the misrepresentation, the BIA held that the IJ did not clearly err because "[t]he record reveal[ed] equivocal accounts of what occurred." J.A. 4. Regarding Aoko's potential recanting of the misrepresentation, the BIA noted that even if it "were to find that the timely recantation exception applies in this context," there was "no indication" that Aoko "made any efforts to correct or withdraw the information provided in her application before the interview," and thus any recantation was not timely. J.A. 4.

11

Regarding the waiver application, the BIA "considered the hardship factors" and found that the IJ did not err in denying the application. J.A. 5. In particular, the BIA noted that Aoko "ha[d] not established that her mother would not be eligible for government aid, such as medicaid or medicare" or "other types of assistance such as food stamps or whether she is physically able to find and maintain employment." J.A. 5. Finally, the BIA ordered Aoko removed because she had failed to post a voluntary departure bond. J.A. 5.

Aoko timely petitioned for review.

II.

A.

Where, as here, the BIA affirms and supplements an IJ's order, "the factual findings and reasoning contained in both decisions are subject to judicial review." Niang v. Gonzales, 492 F.3d 505, 511 n.8 (4th Cir. 2007). "[A] decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law." 8 U.S.C. § 1252(b)(4)(C). "We review the BIA's administrative findings of fact under the substantial evidence rule," Haoua v. Gonzales, 472 F.3d 227, 231 (4th Cir. 2007), and are obliged to treat them as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B). "We also defer to credibility findings that are

12

supported by substantial evidence." Camara v. Ashcroft, 378 F.3d 361, 367 (4th Cir. 2004). "Though broad, this deference is not absolute," id., as an IJ's adverse credibility determination must be supported by "a specific, cogent reason," id. (quoting Figeroa v. INS, 886 F.2d 76, 78 (4th Cir. 1989)).

B.

Here, an initial question surrounds the applicable burden of proof. The government has the initial "burden of establishing by clear and convincing evidence that . . . the alien is deportable." 8 U.S.C. § 1229a(c)(3)(A). At the relief stage, however, the burden shifts to the noncitizen. 8 C.F.R. § 1240.8 sets out the applicable burdens of proof. Subsection (d), which covers relief from removal, provides as follows:

> The respondent shall have the burden of establishing that he or she is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion. If the evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

8 C.F.R. § 1240.8(d). See also 8 U.S.C. § 1229a(c)(4)(A) ("An alien applying for relief or protection from removal has the burden of proof to establish that the alien [ ] satisfies the applicable eligibility requirements.").

Aoko conceded deportability. When her immigrant-worker petition was approved, she sought relief from deportation

13

through adjustment of status. To be eligible to adjust her status to that of LPR, Aoko must be "admissible to the United States for permanent residence . . . ." 8 U.S.C. § 1255(a).

INA § 212 sets out provisions relating to "inadmissible aliens." 8 U.S.C. § 1182. Under INA § 212(a)(6)(C)(i), "[a]ny alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible." 8 U.S.C. § 1182(a)(6)(C)(i). It is undisputed that citizenship is a "material fact," and that TPS is an "other benefit"; the disputed question is whether Aoko's representation of Liberian citizenship was willful.

In short, because the evidence indicated that a mandatory ground for the denial of Aoko's adjustment-of-status application (i.e., willful misrepresentation of a material fact to obtain an immigration benefit) may apply, Aoko had the burden of proving by a preponderance that it did not (i.e., that any misrepresentation was not willful).

C.

We next proceed to examine whether substantial evidence supports the conclusion that Aoko willfully misrepresented her citizenship in the 1991 TPS application, thus rendering her inadmissible under INA § 212(a)(6)(C)(i). We hold that it does.

14

The evidence bearing on Aoko's knowledge of her misrepresented citizenship consisted of (1) the TPS application itself, which contained her signature as well as a certification that the contents of the application were true and correct; (2) Aoko's 1993 testimony from her asylum hearing, in which she testified that she did not read the TPS application before signing it; and (3) Aoko's inconsistent testimony in her 2006 adjustment-of-status hearing, in which she first stated that she did not read the application, but then testified that she did read it, saw that it said Liberia, but executed it anyway.

Because the evidence was equivocal as to whether Aoko read the TPS application at the time she signed it (and thus whether she had knowledge of its falsity at that time), it supports the IJ's finding and the BIA's affirmation of that finding. The evidence in favor of Aoko's position is simply not so strong that "any reasonable adjudicator would be compelled to conclude" that the IJ and the BIA erred in reaching a contrary conclusion. 8 U.S.C. § 1252(b)(4)(B). Aoko's arguments to the contrary fail to recognize the deferential standard of review with which we are obliged to treat the IJ's findings of fact and the BIA's affirmation of those findings; indeed, her argument heading asserts only that a "[p]reponderance" of evidence shows that she lacked knowledge of the misrepresentation. Aoko Br. 13.

We thus hold that substantial evidence supports the conclusion that Aoko willfully misrepresented her citizenship.

D.

We next examine whether substantial evidence supports the conclusion that Aoko did not timely recant the misrepresentation. Assuming without deciding that the recantation principle applies to inadmissibility determinations, we hold that substantial evidence supports the IJ's and BIA's determinations that Aoko failed to timely recant.

Neither of Aoko's two main arguments suffice to show that a reasonable adjudicator would be compelled to conclude that the IJ and BIA erred in this regard. First, Aoko argues that the only evidence in the record concerning the recantation is her 1993 testimony, and that testimony supports the view that she recanted immediately upon learning of the misrepresentation. But, as the IJ noted, "there were some credibility issues with the hearing in 1993," and "[w]e do not have complete information about exactly what was said at the TPS interview and when . . . ." J.A. 317. In other words, the IJ took account of the previous IJ's adverse credibility finding, and decided not to credit Aoko's testimony regarding any recantation. We must "defer to credibility findings that are supported by substantial evidence" where those findings are supported by "a specific, cogent reason." Camara, 378 F.3d at 367 (4th Cir. 2004). The 1993 IJ

16

adequately explained that the reason for his credibility determination stemmed from "the discrepancy between [Aoko's] testimony and the glaring absence of . . . facts [concerning her asserted beating and hospitalization] in her application," as well as the fact that she "claimed that first she was raped and then changed her testimony that, no, she wasn't raped, she was only threatened to be raped." J.A. 1104. This is a specific, cogent reason, and supports the IJ's determination that because of the credibility issues of the 1993 testimony, Aoko failed to "demonstrate[] sufficiently that she timely withdrew the misrepresentation." J.A. 318.

Second, Aoko argues that the lack of markings on the TPS application show that it was "never adjudicated on the merits," and thus that Aoko "withdrew the application before a decision was made" on it. Aoko Br. 20. But Aoko must show more than just a retraction before the TPS application was adjudicated on the merits. See Matter of Namio, 14 I. & N. Dec. 412, 414 (BIA 1973) ("[R]ecantation must be voluntary and without delay."). As the IJ noted, a timely withdrawal would have come "very shortly after she had knowledge of the misrepresentation . . . ." J.A. 318. And because the evidence was equivocal as to when Aoko knew of the misrepresentation in the TPS application, it was also equivocal as to when a timely retraction should have taken place.

17

In sum, substantial evidence supports the conclusion that Aoko failed to timely recant.

## III.

## A.

Aoko next argues that the BIA committed legal error in concluding that she failed to establish that her LPR mother would suffer extreme hardship were Aoko to be removed, and thus that Aoko was ineligible for a waiver under INA § 212(i). We hold that we lack jurisdiction to examine this issue.

Under INA § 212(i)(1), a noncitizen inadmissible for fraud or material misrepresentation may seek a waiver based on extreme hardship to an LPR or U.S. citizen spouse or parent. 8 U.S.C. § 1182(i)(1). INA § 212(i)(2) provides that "[n]o court shall have jurisdiction to review a decision . . . regarding a waiver under paragraph (1)." 8 U.S.C. § 1182(i)(2). See also 8 U.S.C. § 1252(a)(2)(B) ("[N]o court shall have jurisdiction to review [ ] any judgment regarding the granting of relief under section . . . 1182(i) . . . ."). However, the REAL ID Act of 2005

> added a new subsection (D) to the judicial review
> provisions in the [INA]. Subsection (D) states:
> "Nothing in subparagraph (B) . . . which limits or
> eliminates judicial review, shall be construed as
> precluding review of constitutional claims or
> questions of law raised upon a petition for review
> filed with an appropriate court of appeals in
> accordance with this section." 8 U.S.C. §
> 1252(a)(2)(D). Subsection (B)'s jurisdiction-stripping
> default remained unchanged, but was revised to
> indicate that courts lacked jurisdiction "except as

18

provided in subparagraph (D)." Id. § 1252(a)(2)(B). In effect, therefore, the REAL ID Act confers upon courts of appeal a narrowly circumscribed jurisdiction to resolve constitutional claims or questions of law raised by aliens seeking discretionary relief.

Higuit v. Gonzales, 433 F.3d 417, 419 (4th Cir. 2006).

Regarding the relevant factors in an extreme-hardship analysis, the BIA has stated that they

include, but are not limited to, the following: [1] the presence of lawful permanent resident or United States citizen family ties to this country; [2] the qualifying relative's family ties outside the United States; [3] the conditions in the country or countries to which the qualifying relative would relocate and the extent of the qualifying relative's ties to such countries; [4] the financial impact of departure from this country; and, finally, [5] significant conditions of health, particularly when tied to an unavailability of suitable medical care in the country to which the qualifying relative would relocate.

In Re Cervantes-Gonzalez, 22 I. & N. Dec. 560, 565-66 (BIA 1999).

B.

Aoko argues that the BIA's denial of her § 212(i) waiver application was "legally incorrect" because (1) the BIA failed to consider all the hardship factors; and (2) the BIA applied the higher standard of "extreme and unusual hardship," rather than the applicable standard of "extreme hardship." Aoko Br. 21, 23. We disagree and hold that Aoko fails to raise a question of law as to the denial of her § 212(i) waiver application. Accordingly, this Court lacks jurisdiction to examine it.

19

The IJ's written decision was thorough, examining (1) Aoko's mother's family ties in this country; (2) her family ties in Nigeria; (3) country conditions in Nigeria; (4) the financial impact that Aoko's deportation would have on her mother; (5) Aoko's mother's health; and (6) Aoko's children. The IJ determined that "economic hardship [was] the main factor in this case," but concluded that the economic hardship that would face Aoko's mother was insufficient "in the absence of other significant equities." J.A. 80-81. The BIA adopted the IJ's analysis, finding, in addition, that Aoko had not shown "that her mother would not be eligible for government aid, such as medicaid or medicare," or whether she might be "eligible for other types of assistance such as food stamps or whether she is physically able to find and maintain employment." J.A. 5. Neither the IJ nor the BIA used the term "extreme and unusual hardship," and neither analyzed whether any hardship Aoko's mother would face would be unusual. Accordingly, all relevant hardship factors were analyzed, and neither the IJ nor the BIA applied a more stringent legal standard.

Though Aoko frames her challenge as a legal one, it raises no legal questions, and we thus lack jurisdiction to hear it.

IV.

For the foregoing reasons, Aoko's petition for review is

DENIED.

20