RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0214p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

MARIO E. RUIZ-DEL-CID,

         *Petitioner,*

                  No. 13-3663

  v.

ERIC HOLDER, JR., Attorney General,

         *Respondent.*

On Petition for Review of a Final Order
from the Board of Immigration Appeals
No. A070 806 988.

Decided and Filed:  August 29, 2014

Before:  DAUGHTREY, CLAY, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Blake P. Somers, BLAKE P. SOMERS LLC, Cincinnati, Ohio, for Petitioner. Lindsay M. Murphy, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

   STRANCH, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. CLAY, J. (pp. 9–11), delivered a separate dissenting opinion.

_____

## OPINION

_____

   STRANCH, Circuit Judge.  We like to think that Poor Richard was right about honesty. *See Farrington v. State of Tennessee*, 95 U.S. 679, 682 (1877) ("The trite old aphorism that 'honesty is the best policy,' is true alike of individuals and communities.  It is vital to the highest welfare.").  Unfortunately, it seems, some interpretations of our immigration laws encourage

dishonesty and punish those who do not take the hint. This can be true for the asylum seeker who has uttered a falsehood in order to be allowed to live or work in this country—admitting the falsehood can make him ineligible for cancellation of removal because he cannot establish "good moral character." But not always—because the law also recognizes the doctrine of retraction. A lie may "stand[] on one leg, truth on two." Benjamin Franklin, Poor Richard's Almanack, ¶ 21 (U.S.C. Publ'g Co. 1914) (1735). The doctrine of retraction preserves the balancing grace of honesty by acknowledging that timely retraction of the lie lifts the bar of ineligibility and provides the opportunity to establish qualification for cancellation of removal. Here, we address a decision by the Board of Immigration Appeals that, if upheld, would disturb that delicate balance.

Mario Ederrilso Ruiz-Del-Cid filed an application for asylum in 1993 and was interviewed by an asylum officer in 2007. After the asylum officer denied his application, the Department of Homeland Security initiated removal proceedings against Ruiz and his wife, who was also in the country illegally. The couple applied to cancel their impending removal. The Department of Homeland Security contested their application and, in 2011, they appeared before an Immigration Judge.

Upon taking the stand, on direct examination by his own lawyer, Ruiz voluntarily confessed that his asylum application contained an untrue statement and that he repeated the lie at his 2007 asylum interview. He testified that a notary public had written his 1993 application for him because Ruiz could not read or write English at the time. Ruiz learned only after he submitted the application that the notary had written that Ruiz had been threatened by guerillas in Guatemala. In fact he had not.

Near the end of the hearing, the immigration judge asked, "[W]hy did you tell that to the Asylum Officer?" Ruiz replied:

> Perhaps because I didn't have the advice of an attorney and I made a comment with the same people, with the same people who have the same case as mine. And they told me you have to sustain what you said in the application because if you don't, you are going to be, your work permit is going to be revoked and you are going to be deported. And to tell you the truth, from my working permits depends my life hood and my family's life hood. I to tell the truth, I have this

deep inside of me in my heart that I swear over the Bible to tell the truth and I didn't.

A.R. 183. Ruiz's lawyer explained why he had recanted:

Once [Ruiz] advised me that the information was not correct, we came to a decision that obviously if it's not correct, we cannot go forward with it even if it's going to hurt him, we can't go forward with it. And in fact, we have to actually withdraw it and let the Judge know why it has been withdrawn. It's not an easy choice to make. Obviously the lead respondent is and was very concerned about that because he knows that he made a mistake in April of 2007 [at the interview] as well as in June of 1993 [on his application].

A.R. 280. No government action preceded the retraction and the government's lawyer told the immigration judge, "I really was not expecting this." A.R. 263.

The government's surprise was understandable: Mr. Ruiz had just voluntarily (and perhaps fatally) harmed his case for cancellation of removal. The government may only cancel removal if the applicant "has been a person of good moral character" during his time in the United States. 8 U.S.C. § 1229b(b)(1)(B). The problem for Ruiz is that "[n]o person shall be regarded as, or found to be, a person of good moral character," 8 U.S.C. § 1101(f), if he "has given false testimony for the purpose of obtaining any benefits under this chapter," including asylum, § 1101(f)(6). Mr. Ruiz's statements during his 2007 interview constitute "false testimony" for the purposes of section 1101(f). *See Medina v. Gonzales*, 404 F.3d 628, 635–37 (2d Cir. 2005); *Matter of M-*, 9 I. & N. Dec. 118, 119 (BIA 1960); *In Re R-S-J*, 22 I. & N. Dec. 863, 865 (BIA 1999).

There is a longstanding exception to this rule, however: the doctrine of retraction. "[W]here an alien in an immigration proceeding testifies falsely under oath as to a material fact but voluntarily and without prior exposure of his false testimony comes forward and corrects his testimony, perjury has not been committed and the charge based thereon is not sustained." *Matter of M-*, 9 I. & N. Dec. at 119; *see also Matter of Namio*, 14 I. & N. Dec. 412, 414 (BIA 1973). The few published decisions of the Board of Immigration Appeals that address the doctrine in the context of the Immigration and Nationality Act explain that a retraction must be "voluntary" and "timely" (which the decisions also characterize as "without delay"). *See Matter of M-*, 9 I. & N. Dec. at 119; *Matter of Namio*, 14 I. & N. Dec. at 414.

The immigration judge in this case did not consider whether Ruiz had timely retracted his prior testimony. Instead, the judge found a "clear violation" of Section 101(f)(6). Although the judge believed that Ruiz had shown an honest remorse for his earlier false testimony, he held that the current remorse did not purge Ruiz from his prior false testimony. Accordingly, the judge concluded, Ruiz was "statutorily barred" from being determined to be a person of good moral character.

Ruiz appealed the ruling to the BIA, arguing that his retraction had been both voluntarily and timely. Stating that "recantation must be timely and without delay," the BIA, in a single-member decision, concluded that the retraction exception did not apply because it was not timely. "The respondent may have been able to benefit from this doctrine had he recanted his statements in his asylum application at the time of his asylum interview, but here he waited until he was called to appear in Immigration Court seeking other relief," the BIA wrote. "The respondent delayed retraction of his false testimony before the asylum officer for 4 years" and may not benefit from the doctrine of recantation.

We review the BIA's resolution of a question of law de novo but, pursuant to the rule of *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), will defer to its construction of an ambiguous statutory provision within its jurisdiction unless that construction is "arbitrary, capricious, or manifestly contrary to the statute." *Sad v. INS*, 246 F.3d 811, 815 (6th Cir. 2001) (quoting *Chevron*, 467 U.S. at 844). We afford less deference to constructions promulgated in the BIA's nonprecedential single-member decisions. *See, e.g.*, *Martinez v. Holder*, 740 F.3d 902, 909–10 (4th Cir. 2014); *see also Japarkulova v. Holder*, 615 F.3d 696, 700–01 (6th Cir. 2010). Although still entitled to respect, "[t]he weight of such a judgment" in an unpublished single-member decision "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with early and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The BIA's factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4); *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). If the BIA has failed to adequately explain its reasoning, "[t]he reviewing court should not attempt itself to

make up for such deficiencies: 'We may not supply a reasoned basis for the agency's action that the agency itself has not given.'" *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 436 U.S. 29, 43 (1983) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

The facts are not in dispute. The question here is whether Ruiz's voluntary confession qualifies under the doctrine of retraction—a question which turns on whether he timely retracted his false testimony.

The BIA has defined timeliness as a question of whether the petitioner retracted her false statement before its falsity had been or was about to be exposed. *See, e.g., Matter of M-*, 9 I. & N. Dec. at 119 (alien's retraction made "without delay" if he "voluntarily and without prior exposure comes forward and corrects his testimony"); *In Re: Irene Chelagat Cheruiyot*, A95 204 157, 2007 WL 2074420, at *2 (BIA June 15, 2007); *In Re: Francisco Saez-Sosa*, A71 899 535, 2007 WL 1125707, at *1 (BIA Feb. 23, 2007); *In Re: Jose Valadez-Munoz*, A75 219 367, 2006 WL 1558823 at *2 (BIA Apr. 12, 2006); *see also In Re: Serafin Alejandro Mendoza Lara*, A079 376 389, 2010 WL 4971051, at *1 (BIA May 20, 2010) (apparently equating timeliness with retraction "without prior exposure of . . . false testimony"); *Costa v. Att'y Gen. of the U.S.*, 257 F. App'x 543, 546 (3d Cir. 2007) (retraction made almost two years later permissible "because he corrected [the false statements] voluntarily and prior to any exposure by the government."). Moreover, "the length of time between a misrepresentation and the claimed retraction of it is not determinative of its timeliness." *In re: Kalombo Kalonji*, A098 926 168, 2010 WL 673495, at *1 (BIA Jan. 26, 2010). Rather, "the BIA has repeatedly held that 8 U.S.C. § 1101(f)(6) does not bar a person from establishing good moral character when he has 'voluntarily and prior to any exposure of the attempted fraud corrected his testimony.'" *Costa*, 257 F. App'x at 546 (quoting *Matter of M-*, 9 I. & N. Dec. at 119). The inquiry thus focuses on the underlying statutory concept of good moral character by distinguishing between those applicants who retract false testimony when it is clear that impending revelation of the lie by others will expose them and those applicants who voluntarily confess and retract at the next appropriate opportunity. This approach is certainly consistent with the purpose of section

1101(f)(6), which, the Supreme Court has explained, is "to identify lack of good moral character." *Kungys v. United States*, 485 U.S. 759, 780 (1988).

Some decisions appear to consider the time between the false statement and the retraction as a relevant, but non-dispositive factor in determining timeliness—but only where there was also an imminent risk of exposure. *See, e.g.*, *Matter of Namio*, 14 I. & N. Dec. at 414 (retraction not timely when one year had passed and exposure was imminent); *Matter of Ngan*, 10 I. & N. Dec. 725, 729 (BIA 1964) (retraction not timely when made "some three and half years later . . . and after investigation disclosed evidence that the respondent was not in fact the person he claimed to be"); *Valadez-Munoz v. Holder*, 623 F.3d 1304, 1310 (9th Cir. 2010) (concluding that where applicant did not recant until six years after his false statements when it was clear that the "false representations would not succeed in getting him admitted into the country" the applicant "could not take advantage of the timely recantation doctrine."); *cf. Jian Kang Zheng v. Attorney Gen. of U.S.*, 264 F. App'x 228, 230 (3d Cir. 2008) (finding that substantial evidence supported the IJ's determination that the applicant's retraction three years after his false statements was not timely where the IJ had warned the applicant at the beginning of the hearing about the consequences of filing a frivolous application.). And where there is no risk of exposure, some decisions use the close connection in time between the false statement and the retraction to support a finding that the statement was not an intentional misrepresentation. *See In Re: Paula Garcia*, A77 999 886, 2006 WL 448342, at *2 (BIA Jan. 19, 2006) ("The fact that she very shortly thereafter answered the question in the affirmative renders her mistaken report and its subsequent correction one inseparable incident out of which intention to deceive cannot be drawn.").

Unfortunately, the BIA's retraction doctrine is sometimes misunderstood. A decided minority of cases assume without analysis that retraction must occur very shortly after the false statement is made for it to be timely. *See, e.g.*, *Aoko v. Holder*, 518 F. App'x 169, 177 (4th Cir. 2013) (agreeing with the IJ that "a timely withdrawal would have come 'very shortly after she had knowledge of the misrepresentation'" where the IJ also found that the applicant's testimony from the hearing where she retracted was not credible). However, these cases depart from the

consistent rule that a retraction is untimely only when it "is made in response to the actual or imminent exposure of the misrepresentation." *In Re: Kalombo Kalonji*, 2010 WL 673495, at *1.

To recap:  The issue addressed by the BIA is the statutory requirement that an applicant must be a person of "good moral character" to merit cancellation of removal, 8 U.S.C. § 1229b(b)(1)(B), as defined by the false testimony exclusion under 8 U.S.C. § 1101(f)(6). *See Kungys*, 485 U.S. at 782 ("Section 1101(f)(6) . . . is part of a definition of what constitutes a lack of 'good moral character' for purposes of qualifying for immigration."). According to the BIA's longstanding interpretation of those provisions, applicants who gave false testimony but corrected their testimony voluntarily and prior to exposure or threat of imminent exposure may still be persons of good moral character.  *See, e.g.*, *Matter of M-*, 9 I. & N. Dec. at 119; *see also Costa*, 257 F. App'x at 546.  If there is no immediate risk of exposure, the amount of time between the false statement and the retraction is not determinative of an applicant's qualification for the exception.  *See In re: Kalombo Kalonji*, 2010 WL 673495, at *1; *Matter of M-*, 9 I. & N. Dec. at 119.  This standard rightly places the IJ's and BIA's focus on the statutory requirement of good moral character, an issue for which the length of time between the statement and its retraction provides little information, particularly in light of the longer timeframes attendant to immigration enforcement.  *See Matter of M-*, 9 I. & N. Dec. at 119.

The BIA's decision at issue here, with precious little explanation, concludes Ruiz could not benefit from the retraction exception because he had "delayed retraction of his false testimony before the asylum officer for 4 years."  Perhaps the BIA thought four years to be so long that it saw no need to explain why.  But in fact, its conclusion was incorrect under its own correct statement of the governing standard—that timeliness is determined by asking whether the false statement was retracted before it had been or was about to be exposed.  Ruiz chose, to his own detriment, to retract his statement at the first opportunity he had to testify after his interview and where there is no evidence that his lie would ever have been exposed.  It is no secret that the immigration system moves very slowly; Ruiz should not be prejudiced by the BIA's own backlog.  Here, the BIA's interpretation of the retraction doctrine, although perhaps not "manifestly contrary to the statute," was at variance with its own binding precedent and cannot

stand.  *See Valdiviezo-Galdamez v. Att'y Gen. of the U.S.*, 663 F.3d 582, 605 (3d Cir. 2011); *see also Idaho Power Co. v. FERC*, 312 F.3d 454, 464 (D.C. Cir. 2002).

We cannot, however, determine eligibility for cancellation of removal under the four elements of 8 U.S.C. § 1229b(b)(1)(A)-(D).  The IJ found that Ruiz had satisfied the physical presence requirement of (A) and had not been convicted of a disqualifying offense under (C).  He found that Mr. Ruiz's wife satisfied the hardship requirements of (D) but made no determination of that issue for Mr. Ruiz.  The proper course, therefore, is to remand to the BIA so that the board can determine whether Mr. Ruiz satisfies the hardship clause and is thus eligible for cancellation of removal.  *See Costa*, 257 F. App'x at 547.

We therefore **VACATE** the decision of the Board of Immigration Appeals and **REMAND** to the Board for further proceedings consistent with this opinion.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting.  Although it is not entirely clear from the record that Petitioner Mario Ederrilso Ruiz-Del-Cid knew at the time he submitted an asylum application in 1993 that it contained false material statements, it was clear by 2007, that Petitioner was aware of these falsities.  In fact, not only did Petitioner fail to retract those false statements at the time, he also repeated the lies again during an interview with an asylum officer.  When asked by an immigration judge why he lied to the asylum officer, Petitioner stated as follows:

> Perhaps because I didn't have the advice of an attorney and I made a comment with the same people, with the same people that have the same case as mine.  And they told me you have to sustain what you said in the application because if you don't, you are going to be, your work permit is going to be revoked and you are going to be deported.

(A.R. at 273.)  The immigration judge and the Board of Immigration Appeals ("BIA") found this explanation unconvincing.  The majority disagrees, concluding that Petitioner's explanation and the facts surrounding his case provide sufficient grounds for application of the doctrine of retraction.  Because I disagree with the majority's characterization of this doctrine and its application in this case, I respectfully dissent.

First, it does not appear that the law on the doctrine of retraction is as clear as the majority would have us believe.  In fact, the majority goes to some lengths to demonstrate that the only correct interpretation of this doctrine is one that does not consider the amount of time that passed between the making of the false statement and the retraction of that statement.  Although the majority casts aside the small number of cases and BIA decisions that considers the amount of time that passed between the false statement and the retraction, it appears that there is a non-inconsequential number of cases and BIA decisions that do, in fact, consider this amount of time, either as a dispositive issue or as a non-dispositive factor to be considered by an immigration judge.

In the instant case, the BIA's decision was based, in part, on those cases that define timeliness of retraction by the amount of time that passed until the retraction, and also on whether Petitioner retracted when it was possible to do so during his interview with the asylum officer. It does not appear that the BIA relied exclusively on the amount of time that passed; and even if it had, because this is a question "implicating 'an agency's construction of the statute which it administers,' the [majority] should have applied the principles of deference described in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)." *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999). Because the BIA's construction of the doctrine of retraction in this case was not "arbitrary, capricious, or manifestly contrary to the statute," *Sad v. I.N.S.*, 246 F.3d 811, 815 (6th Cir. 2001) (quoting *Chevron*, 467 U.S. at 844), we should defer to the BIA on this issue. Consequently, I disagree with the majority's conclusion.

Even accepting the majority's definition of timeliness of retraction, I dispute the majority's premise that Petitioner's retraction meets the appropriate definition of timeliness. First, Petitioner's retraction was not done "at the next appropriate opportunity." Maj. Op. at 5. In fact, Petitioner admitted during his hearing before the immigration judge in 2011 that he was aware of the falsity of his statements to the asylum officer when he provided them in 2007. Even assuming that Petitioner's false statements might have been excusable in 1993 due to faulty language translations or Petitioner's lack of awareness, Petitioner was certainly aware that he made false statements under oath in 2007—because he believed his status in the country would have been put in jeopardy had he corrected those statements at that time. Petitioner did not need legal counsel to tell him that what he did was wrong. In fact, he openly admitted that he was aware that he lied under oath in 2007. Between 2007 and 2011, Petitioner had multiple opportunities to retract his false statements, but he failed to do so. Instead, he waited until his asylum application was denied and the Department of Homeland Security initiated removal proceedings against him. These facts alone provide substantial evidence to support the BIA's determination that Petitioner failed to timely retract his false testimony.

Furthermore, it is not at all clear from the record that Petitioner's retraction occurred before the exposure of his false testimony was imminent. One can easily read the facts of this

case to conclude that Petitioner did not retract those statements voluntarily before their falsity was about to be exposed.  (Petitioner initially made fraudulent statements in his 1993 asylum application, repeated those fraudulent statements under oath during an interview with an asylum officer in 2007 with the knowledge that those statements were false, and only after his application containing the false statements was denied and his attorney pushed him to correct those statements did he actually retract them before the immigration judge.)  It appears from the record that Petitioner's attorney pressured him to retract those statements because after learning of their falsity, the attorney was not willing to allow Petitioner to continue perjuring himself.[1] Therefore, even if the amount of time that passed between the statements and their retraction is not to be considered, Petitioner still faces the problem of not having "timely" retracted his false statements.

The law seems to contemplate that all of the circumstances surrounding a petitioner's retraction may be taken into account in making a timeliness determination.  In the instant case, where Petitioner permitted his fraudulent version of the facts to stand for at least four years and only retracted his false statements after it became clear to him that they would not be useful in his asylum proceedings, there is more than ample support for the BIA's conclusion that Petitioner's retraction was not "voluntary and without delay." *Matter of Namio*, 14 I. & N. Dec. 412, 414 (BIA 1973).

I would therefore deny the petition for review on the basis that Petitioner's failure to establish the requisite good moral character is dispositive of his claim, and remand is not warranted. *See Reyes v. Holder*, 410 F. App'x 935, 940 (6th Cir. 2011).

---

[1]During the hearing before the immigration judge, Petitioner's attorney stated that

> once [Petitioner] advised me that the information was not correct, we came to a decision that obviously if it's not correct, we cannot go forward with it even if it's going to hurt him, we can't go forward with it.  And in fact, we have to actually withdraw it and let the Judge know why it has been withdrawn.  It's not an easy choice to make. . . .  Once he was advised by counsel that that was inappropriate and could not go forward and must be cleared up no matter how it hurt him, he did it.

(A.R. at 279–81.)